### Spalding v. Taylor et al.

The stat. of 13th February, 1816, imposing a penalty on the owners of any steamer or other vessel for carrying any slave out of the State, without the consent of the master of such slave, does not require that his consent shall be in writing. Such consent may be inferred from circumstances.

APPEAL from the Parish Court of New Orleans, *Maurian*, J.
The judgment of the court was pronounced by

Rost, J. The plaintiff, a resident of the city of St. Louis, in the State of Missouri, sued out a writ of attachment against the steamer Missouri, for damages sustained by the loss of his slave *Felix*, alleged to have been carried by the said steamer from New Orleans to St. Louis, without his consent or knowledge. The steamer was attached, and the defendants came into court, by their counsel, and joined issue, alleging that a man did work his passage on board of the Missouri, from New Orleans to St. Louis, bearing the name of *Felix*, but that he was a white man, or at least passed for such, and was considered as such by the respondents; that if he belonged to the plaintiff, he had been allowed by his master to go out of this State frequently, and to work for himself, and to travel about the country as a free man; and that if he was a slave, he was received on board wholly by the fault and negligence of the plaintiff. They further denied, generally, all facts not specially admitted.

Upon this issue the cause was tried by a jury, who gave a verdict in favor of the plaintiff for $1,000. Judgment having been rendered in conformity therewith, the defendants appealed.

The allegations of the defendants that, the man *Felix* was to all appearance a white man, and would have been considered as such by any person who did not know him, is fully made out by the evidence. *Felix*, from his complexion, says one of the witnesses, might have some Indian blood or be of Spanish descent, but no one could suppose he had any African blood; he would pass any where for a white man, and a great many white creoles have a darker complexion than he has. He was dressed like a gentleman, nor was there any thing in his manner or appearance, that indicated him to be a slave. There was no attempt to conceal himself. Witness would as soon have thought of asking any of the passengers for a slave's pass, as *Felix*; and, if he had taken passage in the cabin, witness would have allowed him to sit at table as any other passenger. Witness has seen a great many slaves, but has never seen one whose appearance was any thing like that of *Felix*.

*Gabriel S. Chouteau*, in whose family *Felix* was born, and who owned him after the death of his father, says *Felix* is a very white person for a slave; that he has blue eyes and straight hair; is well made and of good size, and likely to pass for a white person wherever he is not known.

Many other witnesses testified to the same facts, so that we are called upon to hold the defendants liable in damages for an act which no care or prudence on their part could have avoided; and if it be true, as alleged by them, that the slave was received on board by the fault and negligence of the plaintiff, we would find it difficult to resist the equity of their case, and not to consider it as one of those which, according to *Plowden*, are *exempted and fore-prized* out of

the provisions of every statute, by the law of reason, though not expressly mentioned, in order to prevent a failure of justice. Plow. Comm. 13 b. 2 Inst. 118.

The facts that *Felix* was carried from New Orleans to St. Louis, by the steamer Missouri, and that the plaintiff held at that time a valid title to him as a slave, are sufficiently proved, and the first question presented to us is, whether *Felix* was thus carried out of the State, without the consent of the plaintiff. The statute on which he relies does not require that consent to be in writing, nor would we require written proof of assent in any case, if we thought that, by doing so, the party who denies giving it would be enabled to commit a fraud.

The facts applicable to this part of the case are as follows : In the winter of 1842–3, *Felix*, being then at St. Louis, where his master resided, hired himself for several months on board of the steamer Chippewa, trading between St. Louis and Galena.˙ Galena is in the State of Illinois, where involuntary servitude is prohibited. Subsequently the boat was laid up at the landing of a town in the territory of Iowa, where involuntary servitude is also prohibited. *Felix*, after remaining there sometime, left the place without the knowledge of the officers of the boat, and returned to St. Louis, where he subsequently received his wages from the clerk of the Chippewa, at a public tavern, where he was often seen, dressed like a gentleman, and to all appearance free and at leisure. This was in the beginning of 1843. From about that time, till his departure on board of the Missouri, between the 7th and 10th of May of that year, we find him in New Orleans, living with one of the plaintiff's witnesses, who paid no wages for him, and had not, as he informs us, the authority of a master over him. The plaintiff was then in St. Louis. *Felix* remained in that unexplained situation till he engaged his services on board of the Missouri, as he had done before on board of the Chippewa, and went up in her to St. Louis, the place of residence of the plaintiff. He was not carried away from his master, but carried up to him, and must have arrived at St. Louis about the middle of May. There he appears to have remained sometime. *Gabriel Chouteau* says that he saw him several times, in June, 1843 ; he saw him almost daily in the streets ; he appeared to be his own master, controlled by no person, the same as a free person of color ; he was always well dressed, and seemed to do as he pleased. *Felix* was born and raised in St. Louis, well known there, and particularly so, no doubt, to the police of the place. His former master, *Chouteau*, saw him almost daily in the streets; but the plaintiff was determined not to see him. While the plaintiff was in St. Louis, he was informed by one of the witnesses that *Felix* had gone up in the Missouri, and, at the very time he was looking out for testimony, as that witness tells us, for the purpose of attaching the boat here on account of the loss of his slave, *Felix* was there enjoying his freedom openly and publicly, until he saw fit to hire himself on board of the steamer Brazil, to go to Galena, where he remained. When subsequently the plaintiff was informed by the officers of the Brazil, that he could get *Felix* by sending for him to Galena, his answer was that he cared nothing about him, and preferred looking for him to the steamer Missouri. If he had then attached the Brazil for carrying his slave out of the State of Missouri, it is very clear from the evidence that assent on his part would have been presumed, and that he must have failed in his action. He was in error when he supposed that he could obtain in the courts of Louisiana the relief which those of his own State would have refused.

*Felix* was authorized to hire himself on board of the steamer Chippewa, and

to receive his wages; he was then in every respect his own master. Not many weeks after leaving that boat, in the territory of Iowa, he came to New Orleans; and the person with whom he lived here, has testified that he did not exercise the power of a master over him, in the plaintiff's absence. *Felix* must, in that case, have been his own master, as he was before, and the implied assent of the plaintiff to his hiring himself on board of steamboats, must be considered as having continued. Should there be no other motive, we would be bound to presume, in favor of liberty, that the possession of his freedom, which *Felix* had in St. Louis, continued in New Orleans, till the contrary is shown by direct and positive evidence. This enjoyment of his liberty was a *status* under which he could prescribe against the plaintiff's title. Civil Code, art. 3510.

We give full faith to the testimony of *Chouteau* and *Labaume*, and are satisfied that, on account of his color and of his vices, the slave was of very little value at any time. After he had been suffered by the plaintiff to live and act like a freeman, and to go and remain as long as he pleased in States where slavery is prohibited, he must have been utterly worthless, and the jury erred in coming to a different conclusion.

The opinion we have formed on the plaintiff's right of action, makes it unnecessary to remand the cause. We have great doubts whether, after *Felix* had been suffered to hire himself on board of boats trading to places where slavery is prohibited, and to remain in those places till he chose to leave them, the plaintiff can exercise any longer his right of ownership over him; but we have none whatever that, if there were no other reasons operating against his claim, it would be contrary to public policy to entertain it.

The legislature of this State have repeatedly passed laws to prevent free persons of color from coming to Louisiana, and all such as are found here, in contravention to those laws, are subjected to severe punishment. This man *Felix* was in the State of Illinois at the close of 1842, and, after a short stay in St Louis, came to New Orleans. How he came, or why he came, does not appear. If he was still a slave, he was here without a master, and the reasons of public order which induced the legislature to enact those laws, are clearly applicable to him.

For the reasons assigned, it is ordered that the judgment of the Parish Court be reversed, the attachment set aside, and that there be judgment in favor of the defendants for costs in both courts.

*Van Dalson, Goold* and *Winthrop*, for the plaintiff. *Peyton*, and *I. W. Smith*, for the appellants.