### LUCY BROWN, f. w. c., *v.* PERSIFOR F. SMITH, SEWELL T. TAYLOR, warrantor.

The plaintiff was a slave in 1823. Her master was about removing from the District of Columbia to New York, and an indenture of apprenticeship of plaintiff, was made by her father to her master, to bind plaintiff until her majority. Her owner executed an act of manumission of plaintiff, and in the year of 1849, entrusted it to a gentleman of this city. *Held:* It seems as though the act of manumission and indenture were made with a view to the change of residence which followed and most clearly manifest the intention of removing to New York, by the laws of which, in force at the time of the change of residence, it is provided, that any person, not being an inhabitant of that State, who shall be travelling to or from, or passing through the State, may bring with him any person lawfully held by him in slavery, and may take such person with him from the State; but the person so held in slavery shall not reside, or continue in New York, more than nine months, and if such residence be continued beyond that time such person shall be free. The intention to reside in New York, and the actual residence there for, certainly, a year, being proved, the plaintiff became free.

The plaintiff's condition as a free person, could not be affected by the subsequent return to, and residence of her former owner with her, in the District of Columbia, as by a statute of Maryland, of 1796, it is provided that " it shall not be lawful to import, or bring into the State, by land or water, any negro, mulatto or other slave, for sale or to reside within the State, and any person brought in the State as a slave, contrary to this act, if a slave before, shall thereupon, immediately cease to be the property of the person or persons so importing, or bringing such slave within the State.

APPEAL from the Third District Court of New Orleans, *Kennedy*, J. *J. D. Mix* and *Bonford*, for plaintiff. *Benjamin & Micou*, for defendant. *Elmore & King*, for warrantor and appellant.

EUSTIS, C. J. This is an appeal taken by the defendants from a judgment of the Third District Court of New Orleans, by which the plaintiff and her two children are decreed to be free.

It appears by the evidence that the plaintiff, who is a negro woman, was born a slave, and in the year 1823, belonged to *Elijah Mix*, and lived in the service of her master with his family, in the District of Columbia; that some time in that year, *Mr. Mix* removed with his family to New York, and fixed his residence there; that early in 1825, he removed back to Georgetown, and in 1829, he removed back to New York, and that the plaintiff lived in his service during this time; that she was afterwards, in 1832, in the service of *Capt. Wells*, of the U. S. Army, in this city, as a slave, who sold her to *Sewell T. Taylor*, from whom *General Smith*, her present owner, purchased her.

By the law of New York, in force at the time of the change of residence by *Mr. Mix*, it is provided, that " any person not being an inhabitant of that State,

who shall be traveling to or from, or passing through the State, may bring with him any person lawfully held by him in slavery, and may take such person with him from the State; but the person so held in slavery shall not reside or continue in this State more than nine months, and if such residence be continued beyond that time, such person shall be free."

An instrument of writing was produced at the trial, on behalf of the plaintiff, and acknowledged before the Mayor of Georgetown, on the 8th day of May, 1823. It purports to be an indenture of apprenticeship of *Lucy Brown*, in favor of *Elijah Mix*, of Georgetown, as his servant and waiting maid, until she shall attain the age of twenty-one years. It is signed with the mark of *Lucy Brown* and her father, *Harry Brown*, and *Elijah Mix*. This instrument is witnessed by *Samuel Cooper*, an officer in the Army of the United States, who has testified to his signature, though he has no recollection of the instrument.

There was a bill of exceptions taken to the introduction of the deposition of a free negro woman named *Cecilia Markle*, taken under a commission in Washington city, on the ground of incompetency of the witness to testify in a suit in which a Christian white person is concerned, under a statute of Maryland.

The question raised by this bill of exceptions there is no necessity for deciding, inasmuch as we have come to our conclusions independent of the testimony of this witness. And we think the evidence is too clear in favor of the plaintiff's right to her freedom, to require any notice of the charge of the Judge to which exceptions have been taken by the counsel for the plaintiff.

We do not think the force and effect of the indenture, as a piece of evidence, is weakened by the circumstance of there being no evidence of the time of its delivery; nor do we deduce any unfavorable impression from its appearance, nor find any ground for not giving to it the effect of an instrument in the possession of a party interested in procuring it.

It also appears in evidence that, in 1849, the plaintiff entrusted to a gentleman of the bar of this city, an act of emancipation of *Mr. Mix*, in her favor, dated in 1823. This paper has been lost, but we think there is evidence of its existence and purport.

Neither of these instruments, let us admit, had any legal effect, but they point to the conclusion that the plaintiff was to have her liberty so far as the intention of her master could give it to her, and are explained by the fact of his projected removal from Georgetown to New York. She could not remain in servitude for more than nine months after her arrival in New York, and the purpose of the identure was to secure her services until she was twenty-one. She was, at the time, fifteen, and hence the wish of her father that she should be under the protection of her master's family until her majority. It seems to us as though the act of manumission and indenture were made with a view to the change of residence which followed, and most clearly manifest the intention of removing to a State in which the condition of the slave would be changed by it.

The purpose and intention of removing to New York and to reside there, we think, unquestionable. The fact of residence in New York, we think, is equally so. The evidence is not reconcilable as to the precise time beyond a year. It was not less than that period, and was probably several months longer. It was not in the same place. Part of the time, *Mr. Mix* lived in the city, and part in the country; but the evidence satisfies us that, at the time, he had neither residence nor domicil elsewhere than where his family resided.

Her freedom thus established under the laws of the State in which her master

resided, would have been maintained under the laws of this State, had she been brought here after the establishment of her freedom in 1825. It appears that *Mr. Mix* having obtained a government contract, removed back to Georgetown with his family, and took the plaintiff with him in the fall of that year.

It is contended by the counsel for the defendant, that there was no real change of domicil in 1823, by the removal to New York, and that under the jurisprudence prevailing in the District of Columbia, the effect of the law of New York could do no more than suspend the exercise of the master's rights upon the slave during their sojourn, and that on their return to Georgetown, the original status of slavery reattached. The cases referred to in support of this doctrine, are *Adam* v. *Leverton*, 2 Harris & McHenry, 382, and *Mahony* v. *Ashton*, 4th id. 305. These cases were determined by the Supreme Court of Maryland, in 1789 and 1799.

In relation to the change of domicil on the part of *Mr. Mix*, in 1823, we have to observe that there is no circumstance in evidence which weakens the effect of the positive testimony of *Col. Cooper*, as to the removal to New York, and that of the son and daughter of *Mr. Mix*, who though at an early age at the time, must be considered as speaking according to the traditions of the family, as well as on their own recollection of the event. This concurrence of fact and intent is not impaired by the removal back to Georgetown, in 1825, because a new cause is assigned for the change of residence, to wit: the having obtained a contract from the Government. We must also bear in mind that the continuance of the plaintiff in the service of the family, after their return to Georgetown, though consistent with servitude as a condition, is also consistent with her apprenticeship, and that this service continued in the family after their return to New York, in 1829 and 1830.

The first case cited, that of *Adam* v. *Leverton*, does not appear to have any direct bearing in the question; the other is decided on the effect of a statute of Maryland, then in force.

It appears in that case, that *Ann Joice*, a negro woman, was carried with her owner, *Lord Baltimore*, claiming her as a slave, from the Island of Barbadoes to England, and afterwards brought to Maryland by him, claiming her as his slave, between the years 1678 and 1681, and that she, during her life, was held and treated as a slave, and that her issue had been held as slaves ever since. The Court of Appeals, in giving judgment, said : "By a positive law of this State, in 1715, then the province of Maryland, the relation of master and slave is recognized as then existing, and all negro and other slaves then imported, or thereafter to be imported into this province, and all children then born or thereafter to be born of such negroes or slaves, are declared to be slaves during their natural lives. This case being brought before this Court by original proceedings, we are of opinion that it must be governed by the laws of this State, and that, in this case, however the laws of Great Britain in such instances operating upon such persons there, might interpose so as to prevent the exercise of certain acts by the master, not permitted as in the case of *Somersett;* yet, upon the bringing *Ann Joice* into this State, then the province of Maryland, the relation of master and slave continued in its extent, as authorized by the laws of this State, and therefore the judgment of the general Court must be reversed, &c."

We are relieved from the inquiry, whether the plaintiff, by her return to Georgetown in the service of *Mr. Mix*, would fall into the condition of a slave, by a statute of Maryland, passed in 1796, and the decision of the Court of

Brown
v.
Smith.

Appeals under it. That statute provided that "it shall not be lawful to import or bring into this State, by land or water, any negro, mulatto or other slave, for sale or to reside within this State; and any person brought into this State as a slave, contrary to this act, if a slave before, shall thereupon immediately cease to be the property of the person or persons so importing or bringing such slave within this State, and shall be free."

We find this statute adjudicated upon as late as 1820. See *Baptiste* v. *De Valembrun*, 5 Harris & Johnson,- 95. We therefore conclude that the plaintiff's condition as a free person, was not affected by her return, in the service of *Mr. Mix*, to Georgetown, in 1825.

It appears that the plaintiff was first known in Louisiana, in 1831, at Fort Wood, as the slave of *Capt. Wells*. *Mr. Mix* resided in New Orleans from 1838 till his death, several years since, and the plaintiff's condition, as a slave, does not appear to have been drawn in question until this suit, instituted in May, 1851. From this state of things, the law establishes no presumptions which can defeat her right to freedom if once legally established.

Under the jurisprudence of this State, we think the judgment in favor of the plaintiff must be maintained.

This case was tried by a jury, and they allowed the sum of five dollars per month for wages from the service of the citation; the plaintiff took judgment on the verdict without any application for a new trial. An amendment of the judgment is asked in this Court, allowing her $20 per month, for 12 months prior to the institution of this suit. The sum allowed is certainly small, but in looking at the testimony, we find it too loose and unsatisfactory on this subject, to authorize us to increase it.

The judgment of the District Court is therefore affirmed with costs.

There was an application for a rehearing in this case, resting upon a supposed erroneous interpretation of the statute of Maryland, of 1796. The statute is in the following words:

## CHAPTER LXVII.

#### An Act relating to negroes, and to repeal the Acts of Assembly therein mentioned.

*Be it enacted by the General Assembly of Maryland*, That it shall not be lawful, from and after the passing of this Act, to import or bring into this State, by land or water, any negro, mulatto or other slave, for sale, or to reside within this State; and any person brought into this State as a slave, contrary to this Act, if a slave before, shall thereupon immediately cease to be the property of the person or persons so importing or bringing such slave within this State, and shall be free.

II. *Provided, nevertheless, and be it enacted*, That it shall and may be lawful for any citizen or citizens of the United States, who shall come into this State, with a *bona fide* intention of settling therein, to import or bring into this State, at the time of his or her removal into this State, or within one year thereafter, any slave or slaves, the property of such citizen at the time of his or her said removal, which slave or slaves, or the mother or mothers of which slave or slaves, shall have been resident of the United States, or some one of them, three whole years next preceding such removal, and the same to retain as slaves.

III. *And be it enacted*, That nothing herein contained shall be construed to enable any person or persons, so removing as aforesaid, to sell or dispose of any slave or slaves imported by virtue of this act, or their increase, unless such person or persons shall have resided within this State three whole years next preceding such disposition by last will and testament, and dispositions by law for *bona fide* debts, or consequent upon intestacy.

IV. *And be it enacted*, That nothing in this Act contained shall be construed or taken to affect the right of any person or persons traveling or sojourning

with any slave or slaves within this State, such slave or slaves not being sold or otherwise disposed of in this State; but carried by the owner out of this State, or attempted to be carried.

Passed 31st of December, 1796.

EUSTIS, C. J. A rehearing has been applied for on the part of the defendants in this case, for the purpose of reconsidering the effect of the Statute of Maryland of 1796.

Having come to the conclusion on the evidence, that the plaintiff was not a slave on her return to Georgetown, in the service of her master, early in the year 1825, and that her residence at that time was in New York, and that he was not in any sense an inhabitant or citizen of the State of Maryland, according to the adjudged cases of the Supreme Court of Maryland, the plaintiff would not be held reduced to bondage by her return to that State.

In the case of *Bland* v. *Woolfolk*, 9th Gill & Johnson's Reports, 19, determined under this Statute of 1796, it was held that if a negro slave, with the permission of his owner, takes up his residence in another State, such owner cannot resume his property in him after his return to the State, either for the purpose of servitude within the State, or sale to a citizen of Maryland, *even* although the return of the negro originally was against his master's consent.

So in *Cross* v. *Black*, id. p. 199, it was decided that a citizen of Maryland, intending to break up his establishment, and leaving the State with his slaves, with an avowed design of becoming a resident of another State, and actually going out of the State in pursuance of such design, may, before he reaches the point of his intended destination, change his purpose and return with his slaves, without forfeiting his title to them. To subject him to such forfeiture there must be an actual consummated design to remove and place them elsewhere permanently.

We are therefore satisfied that our conclusions, that under the Act of 1796, the plaintiff is entitled to her liberty, are in accordance with the settled jurisprudence relating to that Statute in the State of Maryland.

The Court of Appeals of Kentucky have in a recent case, not reported in full, *Ferry* v. *Street*, decided in the same sense in relation to a slave who had acquired her freedom under a Statute of Pennsylvania, by remaining in that State, with the consent of her mistress, for more than six months.

The application for a rehearing is therefore refused.