## ANN MARIA BARCLAY, f. w. c. *v.* E. W. SEWELL, Curator.

The plaintiff was the slave of a citizen of Louisiana, by whose formal act and consent she was eman-cipated, in the year 1839, in the State of Ohio, where she was carried for that purpose. She sub-sequently returned to Louisiana and has been residing here since as a free person of color, her former master also residing here. *Held:* That she did not forfeit her freedom thus acquired abroad, by returning to the State. Such penalty is not imposed upon free persons of color for returning to the State in contravention of law. The Act of the Legislature in 1846 does not pro-hibit an *express* emancipation of a slave in a foreign State by a master resident in Louisiana. It only guards against manumission being implied from the mere fact that the slave, whether with or without the consent of the master, has been upon the soil of a territory where slavery is pro-hibited.

APPEAL from the Second District Court of New Orleans, *Morgan*, J. *C. Roselius*, for plaintiff. *J. S. Whitaker*, for defendant and appellant.

SPOFFORD, J. The case comes up on the following state of facts:

"It is admitted that the plaintiff acquired by purchase and paid for the pro-perty claimed in this suit, and all further testimony on that subject is dispensed with; the only question submitted and to be decided by the court is, whether the plaintiff has the legal capacity of holding property.

"It is admitted that plaintiff was absent for two months in the State of Ohio, where she was emancipated, and that ever since that time she has been residing here as a free person of color, and that *G. A. Botts* (her former master) has been residing in this city as a citizen of Louisiana."

The emancipation of the plaintiff in Ohio took place in the year 1839, and shortly afterwards, in the same year, she returned to Louisiana.

The question is, did the plaintiff, in 1839, come from Ohio into Louisiana clothed with the *status* of a free person of color? If she did, no subsequent legislation in Louisiana has changed that *status*.

The power of the master to manumit his slave within the limit of Louisiana, has always been qualified by her laws; but no law of Louisiana in existence in 1839, placed any restraint upon the power of the master domiciled here, to manumit a slave in a foreign State who had been carried thither for that pur-pose.

There is no question but that it was lawful in Ohio for a master resident in Louisiana, to disfranchise his slave who had been carried thither.

There is no question but that the emancipation in this instance was complete and formal under the laws of Ohio.

*There* the slave became free by the formal act and consent of her master. Her *status* was changed.

Upon her subsequent return hither, did she relapse into her original condition ?   Not unless some law of Louisiana in force at the time entailed such a penalty upon her for her return.

We have been referred to no such law ; we think there was none.

Something has been said about the general policy of the Louisiana Legislature ; it was undoubtedly always adverse to the indiscriminate manumission of slaves, and now it has become altogether prohibitive of emancipations in the State, probably in consequence of injudicious and impertinent assaults from without upon an institution thoroughly interwoven with our interior lives.

But we find that in 1830, the Legislature recognized the validity of such emancipations as the one under consideration.   In an Act embodying certain police regulations as to free persons of color it was declared, that "these provisions shall not be construed to extend to any free negro, mulatto, or other free person of color, who may have been a slave in this State and who shall have, *with the consent of his owner*, been emancipated in any other State of the Union, and shall have, after such emancipation, returned to this State." (Acts 1830, p. 94, sec. 16.)   Nothing in this statute prohibited thereafter, even by implication, a mode of emancipation thus expressly recognized as lawful up to that time.   And we have been able to find no legislative act previous to the plaintiff's manumission, which would involve such a marked change in the law.

The dangers supposed to flow from an increase in the free colored population out of the rank of slaves, were thought to be sufficiently guarded against by the stringent provisions against free people of color coming into the State. The plaintiff went away a slave; in Ohio she became free by a lawful act of manumission from her master; upon her return hither she subjected herself to all the penalties imposed upon free persons of color for entering the State in contravention of law.   But we do not find one of those penalties to have been a forfeiture of her freedom acquired abroad.   She could be ejected from the State ; but she could not be reduced to slavery by the master who had emancipated her—nor did he ever resume his dominion over her.

The Act of March 16th, 1842, confirms this view of the law as it stood in 1839.   That Act prohibited, for the first time, the carrying of slaves out of this State into free States ; but so far from implying that their condition could not be changed by such a removal it implies the reverse, by providing that slaves so removed shall be subject to all the penalties and regulations provided for in this Act or in preëxisting Acts, against *free persons of color* coming into the State.   Acts 1842, sec. 9, p. 314.   And the next section goes on to declare that nothing in the Act shall be construed to deprive an inhabitant of the State of his right of property in a slave who, *contrary to the consent and will of his master*, shall have gone out of the limits of the State into any other State or territory of the Union, or in any foreign country where slavery does not exist; and that said owner, in case he shall recover the possession of his slave, shall be entitled to his full property, and such slave shall not be admitted to claim his freedom, because he has set his foot upon a soil where slavery is not acknowledged.

The Act of May 30th, 1846, (Acts p. 163,) went one step further, and declared that from the passage thereof, no slave should be entitled to his or her freedom, under the pretence that he or she had been, *with or without the consent of his or her owner*, in a country where slavery does not exist, or in any of the States where slavery is prohibited.

BARCLAY
v.
SEWELL.

It will be observed that this Act does not prohibit an *express* emancipation of a slave in a foreign State by a master resident in Louisiana. It only guards against manumission being implied from the mere fact that the slave, whether with or without the consent of the master, has been upon the soil of a territory where slavery is prohibited.

We may also remark that this enactment was probably called out by a series of decisions in the Supreme Court of this State, which were incorrect in principle, because they held that the *status* of a slave whose master resided in Louisiana, could be changed by even a transient presence upon free territory; a doctrine which was overruled in *Liza* v. *Paissant*, 5 An. 80, where the whole subject is treated and the true doctrine announced as flowing from general principles of law and supported by the highest English and American authorities.

We conclude, that the plaintiff is a free woman of color, and that the judgment must be affirmed.