## T. Landry *v.* L. Klopman.

The Article of the Constitution of the United States which provides for the delivery of fugitive slaves to the owner does not apply to the case of a runaway slave who is arrested in another State, confined in jail, and after advertisement for a reasonable time to notify the owner, sold at public auction for his benefit.

· The laws of the slave States on that subject are matters of police essential to the protection of their citizens, and are designed also for the protection of the owner himself.

A sworn copy of a commitment annexed to the deposition of the witness who examined it and who had the custody of the same, is admissible in evidence.

APPEAL from the Sixth District Court of New Orleans, *Howell*, J.
Durant & Hornor, for plaintiff. *L. Klopman*, for defendant and appellant.

Merrick, C. J. It appears to be conceded, that the slave in controversy was the property of the plaintiff, but the defendant contends that the plaintiff's title has been divested by a Sheriff sale made in Warren County, Mississippi, to one *A. Mizel*, in March, 1855. It appears that the slave ran away from plaintiff's plantation in May, 1854. He was on the 19th of July of the same year committed to jail in Vicksburg, Warren County, Mississippi, as a runaway slave, where he was advertised for six months in the Vicksburg Weekly Whig, and not being called for by his owner, he was then advertised for sale for thirty days and sold to *Mizel*, a dealer in slaves, for $809. The purchaser brought the slave to New Orleans and sold him to the defendant, *Klopman*, for $1100, on the 20th of March, 1855, and this suit was brought to recover the negro on the 27th day of the same month.

The defendant has assumed the burden of proof to show a divestiture of the title of the plaintiff by the sale under the laws of Mississippi.

He is met at the outset of the discussion with the objection that the slave was a fugitive from service due a citizen of Louisiana, and, therefore, the defendant could acquire no title to the same in virtue of the laws of Mississippi, because it is provided in the 3d section of the 4th Article of the Constitution of the United States, " that no person held to service or labor in one State, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due."

The question was before this court in 1848, when the court was equally divided in opinion, and, as a consequence, the judgment of the lower court affirmed. That decision was favorable to the views maintained by plaintiff's counsel. But, as under our system, a single decision is not considered as conclusive upon any question of law, we are compelled by the course of the argument to review that decision.

In the determination of constitutional questions the same rules of interpretation may be resorted to as with other laws. The duty imposed upon the judiciary to discover the spirit and intention of the lawgiver or the true meaning of the instrument is not less imperative than in case of statutes. It is only a labor of greater delicacy, because the rights of sovereignty are brought in conflict and of more grave importance, because the principles involved underlie our social structure, are fundamental and affect more extensive interests. But an adherance to the

44

letter and a violation of the spirit of the instrument ought not to be tolerated or supposed possible.

The history of the Constitution of the United States shows that this clause was introduced into " the Constitution solely for the benefit of the slave holding States to enable them to reclaim their fugitive slaves who should escape into other States where slavery is not tolerated." Story Const., sec. 952.

And the language of the clause clearly shows that this was the intention. It declares that no person held to labor shall, in consequence of any law or regulation, *be discharged from such service or labor*. The regulation here spoken of is one therefore between the slave and his master ; the slave is not to be discharged from labor, but is to be given up. Now this cannot in our opinion be applied to controversies arising between two persons claiming the ownership of a slave depending upon the laws of different States although the slave was a fugitive from labor ; for the slave is not discharged from labor or service, but the right to his service or labor is the subject-matter of a controversy between others, in which, in a legal point of view, he has no interest.

If we hold the contrary, these consequences follow : a slave, the moment he becomes a fugitive, acquires a sacred character under the Constitution and is above the laws and *extra commercium*. He cannot be sold as property nor punished for crime.

The slave of A, a citizen of Louisiana, who is the judgment debtor of B, a resident of Mississippi, by judgment of a Mississippi court, escapes into the latter State and is there seized and sold under execution to pay A's debts. If the doctrine contended for be true, the purchaser acquires no title. See another example *Reynolds* v. *Batson*, 11 An. 729. If a slave, while a fugitive, commits murder or other high crimes in the State to which he has fled, he must, (according to the same doctrine,) be given up to his master, because a fugitive from labor and covered by the letter of the Constitution.

It is thus evident that the Article of the Constitution is not to be taken literally but to be interpreted according to its true meaning and intent.

The question then arises, does it cover the case of runaway slaves who are arrested and confined in jail and advertised a reasonable time to notify the owner, and, in default of the appearance of the latter, sold at public auction for his benefit.

In our opinion the provisions of law which are common to all, or nearly all, of the slave States on the subject of arrest of fugitive slaves partake of a two-fold character, the one being a matter of police essential to the protection of the citizen of the State against the depredations of this class of persons, who are often driven by hunger to commit acts of violence, and are dangerous from their evil examples and nightly meetings to others of their race and the peace of the community at large ; the other, a municipal regulation designed for the protection of the owner himself and necessary to the recovery of his property and in the nature of a service, by which the thing itself is preserved and as much a real salvage of the thing as would be the rescue of the slave from a sinking ship or steamboat ; they do not discharge the slave from service but hold him to serve.

Such being the design of these provisions of law they are no violations of the Constitution, but in aid of it, and if not essential to the existence of the institution of slavery itself, still of the last importance to the internal peace and quiet of these States.

Neither in our opinion are they prohibited by any laws of the United States

under the Federal Constitution, and, if we have rightly comprehended and defined the nature of these regulations, it was so considered by the Supreme Court of the United States in the case of *Prigg* v. *Commonwealth of Pennsylvania*, 16 Peters, p. 539.

On page 625 Mr. Justice Story, as the organ of the majority of the court, says : " To guard, however, against any possible misconstruction of our views, it is proper to state that we are by no means to be misunderstood in any manner whatever to doubt or to interfere with the police power belonging to the States in virtue of their general sovereignty. That police power extends over all subjects within the territorial limits of the States and has has never been conceded to the United States. It is wholly distinguishable from the right and duty secured by the provision now under consideration : which is exclusively derived from and secured by the Constitution of the United States and owes its whole efficacy thereto. We entertain no doubt whatsoever, that the States, in virtue of their general police power, possess full jurisdiction to arrest and restrain runaway slaves and remove them from their borders and otherwise to secure themselves against their depredations and evil · example, as they certainly may do in cases of idlers, vagabonds and paupers. The rights of the owners of fugitive slaves are in no just sense interferred with or regulated by such course; and in many cases the operation of this police power, although designed generally for other purposes, for the protection, safety and peace of the State, may essentially promote and aid the interest of the owners. But such regulations can never be permitted to interfere with or obstruct the *just rights* of the owner *to reclaim his slave* derived from the Constitution of the United States, or with the remedies of Congress to aid and inforce the same."

This was said in reference to a law of Pennsylvania, a free State. *Prigg*, the agent of the owner duly empowered, arrested a fugitive in Pennsylvania and took her to the owner in Maryland. He was indicted and convicted under an Act of Pennsylvania, declaring it to be a crime to carry away a negro or mulatto for the purpose of detaining them as slaves.

. In the case of *Moore* v. *People of Illinois*, 14 Howard, 13, it was held, that the individual States might pass regulations which were in aid of the Constitution and which do not impede, limit, embarrass, delay or postpone the rights of the owner to the immediate possession of his slave and the immediate command of his services. This also was said in reference to the regulation of a free State ; the subject-matter of discussion before the Supreme Court in both cases being regulations tending to discharge the slave from service, but not a question as to the change of ownership of the slave himself.

But, supposing that the principles enunciated do affect a question of ownership, and the absurd consequence does not follow that the State cannot punish by death or imprisonment a fugitive slave who has committed murder or other high crimes, and thus impede or postpone the rights of the owner of the slave, we will consider whether the regulation of the State of Mississippi in question in any just sense deprives the owner of these rights. We think the whole question turns upon the first act, the arrest and detention of the slave by the authorities of Mississippi. If they had the right to make the arrest and commitment and charge a reasonable compensation for the same the rest must follow.

The right is conceded by the Supreme Court of the United States in Prigg's case as a police measure. And it does not impede the rights of the owner because the object is also to preserve his rights ; to prevent the escape of the slave to a

free State or Canada, where his services would be wholly lost to his owner. But if this arrest and detention is legal, the rest of the proceedings in reference thereto are a matter of expediency left to the Legislature. For the owner is justly bound for the fees, advertisements and costs of keeping and guarding the slave in prison or other custody, by which his property is preserved, and good faith requires that the proceedings should not become oppressive to the owner, and that after a reasonable time the accumulating expenses should cease, and not that the slave should be kept in prison until expenses had been created exceeding his value.

After a *bona fide* effort on the part of a State to find the owner, continued for a reasonable time, it appears to us the State may presume that the owner prefers to abandon the slave for the payment of the expenses incurred, and claim any surplus that may be left at the sale rather than advance the costs. He has not been deprived of his slave because the same has been sold to pay his just debts, precisely as in the instance given where sold under execution on a judgment in the State of Mississippi. C. C. 2278.

The statute of Mississippi must be held to be reasonable, because it is similar to the statutes which were in force in this State up to 1857, and the notice of the arrest and commitment is published six months instead of three, as required by our law, and the purchaser is allowed six months longer to redeem his property. It appears to us that the comity which exists between different States requires us to inforce rights acquired under this statute adverse to a citizen of Louisiana, as on the other hand we would do had the sale been made under our own law of a slave belonging to a citizen of Mississippi.

But it is said that the sale made under the law of Mississippi was made without any form of judicial proceedings. Judicial proceedings were not necessary to add force to the statute acting on property in the State of Mississippi. The statute did precisely what our statute did, and what is done on sales of estrays and property sold for taxes, and yet no one supposes that these sales are not valid.

Again it is said that criminal, police and revenue laws are purely local, and forfeitures by reason of such laws are not inforced extra-territorially. This is true, but it has no application to the present case. The court is not asked to declare a forfeiture, but, on the contrary, the plaintiff demands that a right already acquired shall be declared void, and the person in the enjoyment of the same compelled to surrender such right. It is a suit to set aside rights vested under the law of another State. Suppose a slave is sold in Mississippi to pay taxes, will not our courts maintain the possessor in his title? Suppose the goods of a citizen of Louisiana are sold for a violation of the revenue laws of another country and the purchaser comes to Louisiana with them—will our courts deprive the purchaser of property in his possession under a title acquired in another country?

In *qui tam* actions the informer acquires a part of the penalty. Is he not to be maintained in his rights so acquired in all countries? To ask these questions is to answer them. The Acts of the Legislature of Mississippi do not, therefore, appear to be unconstitutional, and, as they appear also to be reasonable and place the citizens of Louisiana on a footing of equality with the citizens of Mississippi, we think rights acquired under them must be maintained.

The objection made to the copy of the commitment was not sufficient to exclude it. It was a sworn copy annexed to the deposition of the witness who examined it, and who, in fact, had the custody of the same. Authentication, under the Act of Congress, is not exclusive of all other modes of proof. We know no good reason why the Sheriff might not, after having compared a copy with the commitment

in his custody, annex the same to his deposition, and swear to its faithfulness, and thus make it proof of the original, of which he is the custodian. Such we understand to be the rule of evidence in our sister States, and we think it is applicable here. Greenleaf, sec. 91, 501, 502, 508.

From all the lights before us we think the sale made in Mississippi was in conformity with her laws, and that the judgment of the lower court should have been in favor of defendant, and the plaintiff left to obtain the proceeds of the sale to his credit in Warren County, Mississippi.

It is, therefore, ordered, adjudged and decreed, that the judgment of the lower court be avoided and reversed, and that there be judgment against the demand of the plaintiff and in favor of the defendant, quieting him in the title and possession of said slave, and that the demand in warranty be dismissed, and that the plaintiff pay the costs of both courts.

SPOFFORD, J., took no part in the decision of this cause.