## J. DESHOTELS et als. *v.* J. B. SOILEAU, fils.

The policy of the State since the Act of the Legislature of the 6th of March, 1857, prohibiting the emancipation of slaves, is that the slaves within her borders shall remain slaves, and there is nothing unconstitutional in such legislation.

Where the testator, by will, directed his residuary legatees, in case his slaves could not be emancipated with permission to remain in the State, to remove them from the State, *after having had them emancipated,* and the Legislature, before the consummation of the emancipation of the slaves according to the forms prescribed by law, passed an Act prohibiting the emancipation of slaves—*Held:* That the slaves had no vested right to freedom under the will, until the formalities required by the laws previously existing, for consummating the emancipation, had been complied with. *Held, also:* That the legacy to the slaves of their freedom, lapsed by the Legislature having passed a law rendering it impossible for them to be emancipated, and they became the property of the heirs-at-law of the testator.

APPEAL from the District Court of the Parish of St. Landry, *Martel, J.* *Swayze & Moore,* and *Dupre & Garland,* for plaintiffs, argued:

The judgment of the District Court is so vague, that we are left to the inference, and the inference only, that the legacy to the slaves having lapsed, it inures to the benefit of the universal legatees instead of the heirs.

First. Because they have forfeited any claim under the will, (if declared valid) having failed to comply with the conditions attached to the legacy to them. So far from doing so, *André H. Deshotels,* on his examination on his *voire dire,* says: "He desired the will should be broken, because he thought it unjust. He never took any steps to have the slaves emancipated."

Secondly. Because, if the legacy to the slaves of their freedom has lapsed, and they are to be returned to the estate, the heirs are entitled to them. The only portion of the will under which the intervenors could assert any claim to the *possession* of the slaves, is in these words: "I will, in the event of my said slaves refusing to leave the State, should the laws of the State require this as a consideration of their emancipation, then I will them to my said nephew and niece, and discharge them from the conditions above, and only require them to have them emancipated whenever the laws of the State will permit them to remain in the State."

94

This, it will be said, is a positive and direct disposition in favor of the intervenor, manifestly showing the intention not to give them to the heirs. Not so. The intention in this clause is still to *emancipate the slaves* " when the laws of the State will allow them to remain in the State." They were only to be placed in their possession for *that purpose* until the period when the emancipation could be effected. There was then still a condition imposed, and on that condition only were they willed to the intervenors. That condition having become impossible, the legacy based upon that condition, which was the motive of the bequest, must fall also.

Upon a careful examination and reading of the will, it seems evident to us that the motive for making it, the important consideration with the testator, his only aim and object, gathered also from his repeated declarations at other times, was the emancipation of his slaves. He did not desire that they should become the property of either the heirs or universal legatees. If this is so, they must be returned to the estate and belong to somebody. In that event, the heirs are entitled to them, even had the testator stipulated expressly the contrary ; for the law gives them inheritance whenever the disposition made of the property in favor of other persons, fail or cannot be carried out. The court must not forget that all testaments are interferences with natural and legal order of descents ; they are exceptions to the general law ; must be construed as such strictly, and in questions of doubt, the general law should prevail. 12 An. 417.

The last question is that involved in the conclusion of the judgment decreeing the return of the slaves to the estate, the statute of March, 1857, having prohibited the emancipation of slaves ; and it is the important issue, if the will is declared valid by your honors. It will be strenuously contended by the learned counsel of the defendant. that the slaves, by the will, became *statu liberi ;* that they acquired a vested right to their freedom, of which they cannot be deprived by any subsequent legislation, and, therefore, as to them, the Act of 1857, is retroactive and as such unconstitutional.

We will not examine the question of vested rights, nor the power of the Legislature (or of the government) to pass laws affecting these rights, or impairing the obligations of contracts. We will leave the court to examine this matter in Story and Kent, where the subject is treated of at length, and content ourselves with the endeavor to show that this inquiry can not be made in this case, because there is no vested rights destroyed or interfered with by the statute of 1857. Rights are either natural, created by law, or arise out of contracts. ·

Leaving to the casuist and to the pseudo-philanthropist, the question of the natural right of the slave to his freedom, we will deal with him here, as we find him in the condition of slavery and considered as property. " A slave is one who is in the power of a master to whom he belongs. The master may sell him, dispose of his person, his industry and his labor. He can do nothing, possess nothing, nor acquire anything but what belongs to his master." C. C. Art. 35.

Slaves, therefore, as such, have no rights but those given them by express statute. In other respects they are like any other property. The right allowed to the master to liberate his slaves upon complying with certain formalities, confers no right upon the slave ; it is a law affecting the right of the master, or rather permitting him to make a *particular disposition* of this peculiar property, under certain circumstances. It is in the nature of a grant to the master to change the character of this property, to alter its condition from slavery to freedom, after a compliance with the formalities which are established in view of the public welfare. Until the formalities are complied with, the master cannot avail himself of this " permission" of the law, nor does the slave acquire any right which is perfect and so absolute as to be beyond legislative interference. It is an inchoate right. 11 An. 425.

It is the attribute of every government to establish and regulate such modifications of the rights of property in things within its jurisdiction, as the public interest requires. 2 An. 381.

" The right of the Legislature to regulate the condition of this class of persons is unquestionable." See 2 An. 180.

" There can be no question as to the legislative power to regulate the condition of this class of persons within its jurisdiction, and to prescribe in what form and by what facts such condition shall be changed." 5 An. 697.

And, finally, in 12 An. 419, repeating the language in 11 An., your honorable court expresses the opinion, that " the policy of the State has annexed condi-

tions to the enfranchisement of slaves, which the court cannot permit to be disregarded. This language holds good of a prohibition to enfranchise altogether.

It has been repeatedly decided that until the formalities which preceded emancipation (under the laws heretofore existing) had been complied with, whatever might be the right of the party to his freedom, the court could only render a judgment ordering the emancipation after compliance with established regulations on that subject. See 3 An. 557; 5 Rob. 300; 1 Rob. 359.

But it is said these slaves were " *statu liberi*" at the death of *Deshotels*, the period when his will began to be operative if valid; and as such they had certain rights, that they were capable of receiving by testament or donation; that they could transmit an estate; that they possessed a certain " état civil"; grant this for argument sake, does that prevent the legislative authority, *which has the power to prescribe in what form and by what fact such condition shall be changed* to arrest *there* the change of condition begun, and to say, " thou shalt have no other right"? Unquestionably not. This is not the case of a right arising from a contract under existing laws, giving to the contracting parties certain positive and absolute obligations. This Act of 1857 is the withdrawal of the permission given to the master to dispose, in a certain way, and under particular circumstances, of this property.

We say further, that there can be no such mixed condition or status as a *statu liber* since the Act of 1857, because a " *statu liber*" is " one who has acquired the right of being free at a *future time*, or on a condition which is not fulfilled, or in a certain event, which has not happened, but who in the mean time remains in a state of slavery." Now, at what *future time*, in what event, &c., can the condition of this class of persons be changed? In no event, in no time.

That matter is irrevocably fixed by the law prohibiting emancipation. The policy of the State, the public necessities, our safety, nay our very social and political existence, forbid any such anomalous mixed state as persons entitled to a freedom which they can never obtain. Before this consideration all questions of private or personal rights must disappear. It may perhaps be urged also, that as the intention of the deceased was to emancipate his slaves, the court is authorized to carry out his wishes by allowing the universal legatee or the executor to remove them beyond the State to some country where slavery is not recognized. To this position, which we cannot consider serious, we would only say, that our courts have no authority but such as is conferred by our laws, and that they can not cause to be done out of the State, that which they have no power to order to be executed here. They cannot indirectly contravene a prohibitory statute.

Since preparing the above, we find the following emancipation case decided in the State of Georgia, which is reported in the National Intelligencer of the 24th of July, 1858:

" *Decision of an Emancipation Case in Georgia.*—The Macon Telegraph of Tuesday says: ' On yesterday morning, *Judge Lumpkin* delivered an opinion involving an emancipation clause in a will, in a case of this kind: A, the testator, had made a will, in which he bequeathed certain negroes for life to B. After the death of B, the negroes were to be free, and carried to a free State or to Liberia. The court decided that this clause in the will was void under our emancipation acts; that the negroes were free *eo instanti* the termination of the life estate in Georgia, and, as a matter of course, contrary to the spirit and policy of our laws in relation to emancipating slaves.' "

*J. H. Overton*, for defendant, argued:

The leading questions involved in the present suit have already been before this court, but in another form of action, and under different issues from those here presented. That case was a suit instituted in June, 1856, by the present defendant, as dative executor of the last will and codicil of *André Deshotels*, who died in this parish in April, 1855, leaving no issue or other forced heirs, against the District Attorney. It was brought under the 77th, 78th and 79th sections of the Revised Acts of 1855, for the emancipation of the slaves of the deceased, liberated by his last will and codicil.

Two of the present plaintiffs were intervenors in the case, and additional to the defence set up by the law officer of the State, pleaded various grounds of nullity in both the will and codicil, which are specifically set forth in the record of the suit, and make part of the evidence of this cause.

It was tried in the month of June following, by a jury of the parish, who, after a full and elaborate investigation of its entire merits, sustained by their verdict

the validity of the will and codicil, and the integrity of its devices, and adjudged
that the slaves of the testator, to whom their freedom was bequeathed, be emanci-
pated without permission to remain in the State.

An appeal was taken by the intervenors from the judgment affirming that ver-
dict returnable to the August term (1856) of this court, where it was argued and
held over under advisement until the last term, when, by a decision of your Hon-
ors, it was reversed, by a dismissal of the proceedings taken by this defendant for
their emancipation, solely upon the ground of the unconstitutionality of the only
existing law providing for such cases, *then* regarded as the only valid and binding
expression of legislative will.

A careful investigation of that case, upon the evidence of which this cause is
to be decided here, will, we think, conclusively establish the validity of both the
will and codicil of the deceased, under which his said slaves claim to be free, and
their clear, legal and indefeasible title *consequently*, to all the rights and immuni-
ties which attach to that condition, *then* secured and guarantied to them by exist-
ing laws.

The case at bar is in its character one of revendication, instituted by the plain-
tiffs, as heirs at law of the testator, claiming to recover, as owners by inheritance,
the entire succession as inventoried, including the slaves liberated by the will,
and charging the defendant with detaining and withholding the said property
from them without color of right, and appropriating it individually to his own
use and profit, and pray to be decreed owners, with a further judgment of five
thousand dollars, their estimate of the hire.

The defence set up denies the allegations of the plaintiffs, and pleads that the
defendant is the dative executor of the will and codicil of the deceased, *André
Deshotels;* that they have been probated in due form of law, and ordered to be
executed; that he has charge and possession of the successional property of the
deceased, yet undisposed of according to law, in virtue of that trust and in due
process of carrying into effect the testamentary injunctions of the testator; that
the said *Deshotels* died without issue or other forced heirs in April, 1855, when
his said will took effect and was duly probated and ordered for execution in June
following; that the said will is valid in law both as to form and the dispositions
it contains; that at the death of the testator, the slaves liberated by him became
absolutely vested with an indefeasible right and title to their freedom, of which
no posterior legislation can constitutionally divest them; and concludes with the
prayer that the demands of the plaintiffs be rejected; that the dispositions and
provisions of the will be held legal and valid; that the said succession, or those
who claim the said slaves as heirs, may be decreed to be divested of all ownership
and property whatever in them, and under the bequest to them of their freedom,
the said slaves may be adjudged to be *statu liberi*, and as such entitled irrevoca-
bly to all the rights and privileges which by law attach to that condition.

Such were the original parties, and such the only issues involved in this litiga-
tion, when *André Hildevert Deshotels* and *Marie Fidelle Soileau*, his wife, inter-
vened, and in singular contrast with their antecedent acts, joined the defendant in
sustaining the will and codicil of the deceased, but only however to the selfish ex-
tent, as shown by their pleadings, of securing their own rich legacy. They were
the nephew and niece of the testator, to whom a valuable bequest of some thou-
sand dollars had been made upon the condition *expressed*, that they were imme-
diately after his death to take the necessary measures for the emancipation of the
slaves named in the will, with permission to them, if possible, to remain in the
State. If by the existing laws their emancipation could not be effected here,
which has since, by the Act of 1857, become impracticable, they were required to
remove them where it could be accomplished, and to furnish to each one of the
said slaves in aid of their removal, one hundred and fifty dollars, and to provide
for them, from the date of the testator's death until their enfranchisement could
be effected, all the necessary food and clothing, and to treat them with kindness
and humanity. These were the positive and clearly expressed obligations imposed
on the intervenors by the testator, and in the language of the will, "upon their
failure to comply with the above conditions, this legacy is to become null and
void, so far as they, the said *André Hildevert Deshotels* and *Marie Fidelle Soi-
leau*, are concerned."

Can any rational mind, upon reading the fourth clause of the will, and the first
and second clauses of the codicil, made more than two years afterwards to the
same effect, come to any other conclusion, but that they promised the testator

faithfully to carry out, after his death, these his last wishes and desires? And how have they discharged the trust so solemnly confided to them, and for the accomplishment of which they were made by his will the beneficiaries of his munificent bounty? Let the nephew himself answer the enquiry.

On the trial of the late proceedings instituted by this defendant, as dative executor, for the emancipation of the slaves, he appeared as an opposing witness, and in his *voire dire* examination upon a challenge to his competency, testified under oath, " that he desired that the will should be set aside, because he thought it was unjust, even if he was to have less as heir than as legatee. He thought it unjust, because it was not such as the deceased always told him he had made it. He was called upon to act as executor in the place of the one named in the will, and he refused to do so. He has never taken any steps to have these slaves emancipated; on the contrary, he has desired that these slaves should be retained in slavery. Deceased told witness that he had made his will, and given all his property to witness and wife."

The further judgment in the case, as appealed from by the defendant, rejects the demands of the plaintiffs, so far as they affect the validity of the will and codicil, which are held to be legal and valid; decrees that the slaves, to whom their freedom is therein bequeathed, be adjudged, notwithstanding, to be the property of the succession of the deceased, and that they be " returned thereto to be disposed of according to law, the statute of the 6th of March, 1857, having prohibited the emancipation of slaves in this State, and that the costs of the suit be paid by the estate of *Deshotels*."

Having thus shown, as we think, conclusively, that the acts in question were executed in strict conformity with the requirements of the law; that the testator was sufficiently versed in the English language to have dictated them in that language, and when thus written, to have understood their contents when read to him and the witnesses; and that they are entitled to be regarded as the truthful depositories of his last wishes. We proceed, in the next place, to examine the legality of the bequests which they contain, of freedom to certain of his slaves, and what rights those testamentary dispositions confer upon them.

The plain and obvious provisions of our law upon that subject had so long been understood and acquiesced in, as a measure of beneficent and humane policy towards that class of our population, that it had become lastingly incorporated with our system of domestic rule and polity. It formed an integral part of that wise law of rewards and punishment, which lies at the foundation of all well-ordered governments, human or divine, and has received, on account of its infallible adaptation, the deserved sanction of every age and relation in life. It has come down to us from the earliest history of Louisiana, nearly a century ago, when her agriculture was in its infancy, and the concomitant relations of master and slave had but just begun.

The law, as it *then* existed, provided that when a testator had emancipated his slave by a last will, the latter might enforce his enfranchisement against any one who opposed or otherwise resisted it. Again, when a slave, after acquiring money from sources independent of his master, gave it to any person to keep, who promised to buy him of his master and emancipate him,—if such person, after having received the money, refused to buy said slave according to promise, or having bought him refused to liberate him, the slave could appear in court and enforce a specific performance of the obligation. Or, if any one had stipulated with a slave to buy him of his master, under a promise to enfranchise him, whenever he reimbursed him the purchase money, and should, after he had bought him, refuse either to receive the money and set him free, or having received it, should likewise refuse to liberate him, the slave could also appear in court and compel the performance of the contract. Partida 3, tit. 2, salv. 8. Such were some of the beneficent provisions of the Spanish law in force in this country for nearly a half century, and until after its cession to the United States, when it underwent, in 1807, by an Act of the Legislative Council, some modifications, leaving however the right to emancipate intact, when once legally acquired.

This Act, for the most part, directory of the forms to be pursued in cases of emancipation, was, in its provisions, restrictive only as to the age of the slave and his good character previously, and even these conditions were dispensed with, in cases where the slave to be emancipated had saved the life of the master, his wife or any of his children.

In the following year, the Code of 1808 was adopted, recognitive of the same

right, that " a master may manumit his slave in this Territory, either by an act *inter vivos* or by a disposition made in prospect of death, provided that such manumission be made with the forms and under the conditions prescribed by the special law enacted thereupon by the Legislature." O. C., Art. 25, p. 40.

Experience had fully demonstrated the efficacy and wisdom of such laws, when those relations of master and slave came in for their appropriate share in the more comprehensive textual legislation of the Code of 1824. By its provisions, ·the powers and rights of each were more fully and clearly defined, and *this* strong incentive to the slave, as a guerdon for his obedience, fidelity and devotion to his master, was amply maintained. The subsequent Acts of the Legislature for the years 1827, 1830, 1831, 1842, 1852 and 1855, were only amendatory of the forms to be pursued in effecting emancipations, with additional guards and checks against its abuse; but in nowise did they affect existing cardinal legislation upon the subject.

Additional to the laws already in force touching that relation, the Code of 1824 expressly authorizes the slave (an exception to his general incapacity) to contract on his own account for his emancipation, Art. 1783; and further establishes the status of one who had acquired the right of being free at a future time, his capacity to receive by donation or testament, and his right to the protection of the laws against all attempts to disseize him of his vested freedom. Arts. 193, 194.

The cursory review we have taken of this branch of the law from the earliest settlement of the Territory down to our own times, has been entirely with the purpose of illustrating the settled views so long entertained here, and so uniformly embodied in the legislation of the country. From such an exposé of what was obviously, for so long a time, the uniform and invariable policy of the State in matters of emancipation, we expect to maintain before this court, that no interpretation should be given to the Act of 1857, beyond the prohibition to emancipate *from and after its passage.*

Such a statute repealing all remedy for perfecting title to rights which may continue to be vested, under laws yet in force and intact, would, we have no doubt, in the enlightened age of the English Judiciary, when Coke, Hobart and Holt were the learned and intrepid expounders of its jurisprudence, have been pronounced void as against common right and reason. The same sense of justice and freedom of opinion which distinguished those ornaments of the English Bench in their resistance to destructive innovations and encroachmenes by Acts of Parliament, upon those great and fundamental principles which underlie and support all government and property, would, if adopted by our own courts, go far towards the protection of individual rights against the follies and inconsistencies of our own legislation. It is only by the free and fearless exercise of either *this* power, or that resorted to in its stead, that when a statute is " contrary to natural equity and reason, or repugnant or impossible to be performed," the courts, upon the presumption that no such absurd or unjust consequence was within the contemplation of the law, ought, out of duty and respect to the law-giver, to intervene and give it a *reasonable* interpretation.

Such an interpretation would be, in our judgment, to confine the prohibition enacted by the statute to the emancipation of the slave *within the State*, which is distinct and different from acquiring a right and title to freedom, and is but the perfection of the latter by a compliance with the formalities prescribed for its accomplishment. The condition and status of a slave who has acquired that right is, while in obeyance, restricted in his legal capacity, and subject to service until his enfranchisement; when it is to take effect at some future time. When emancipated, he becomes a free agent, no longer liable to service, and exempt from the civil disabilities which attach to his condition as a *statu liber.* C. C. Art. 143; *Angelina* v. *Whitehead*, 3 An. 556.

But constructively carried to the extent contended for and evidently assumed by the plaintiffs, as the grounds of recovery in this case, would be to fasten another shackle to the many which already, under the positive restrictions of our laws, clog that free and unrestricted disposition of one's own property, in a case too where the will of the owner could be carried out or executed by removal or colonization, and without violation of the law.

If, therefore, the right of acquiring and disposing of property gratuitously, by last will, remains in force as it was previous to the passage of the Act of 1857, and unaffected by its prohibitory provisions;—if, as affirmed by this court in one

of their late decisions, the testament be a law, devolving upon courts as their first duty, in that as in other laws, to ascertain the intention of the law-maker, and when satisfactorily ascertained, to execute it, it follows, of necessity, that the dispositions whether in the manumission of a slave, which is but the donation to him of his value, or a universal legacy, must alike stand or fall as the intention of the testator can or cannot be carried into effect consistently with the rules of law.

But there yet remains in this connexion another consideration which ought to enter into the views of the court, and have its proper weight in the application and effect to be given to this statute. It is without any preamble exposing its object, and we are, therefore, left to ascertain its intent and meaning by other means. But it is no less clear, that the evident purpose of the Legislature was effectually to prevent any addition to the free-colored population of the State, by emancipation within its limits, in virtue either of testamentary dispositions, or in any of the other modes authorized by our laws.

Adopting the policy of a majority, if not the entire slave-holding States of the Union, regarding this class of their population, as far back as 1842, this State enacted that " all *statu liberi* in the State, when they become free, shall be transported out of the State at the expense of their last owner, by proceeding before the District Court, at the suit of any citizen, and each *statu liberi*, when transported out of the State, shall, on returning into the State, be liable to all the penalties provided by law against free negroes or persons of color coming into the State." And in 1852, ten years afterwards, another Act was passed, providing in its first section that, thereafter, no slave should be emancipated in the State, except upon express condition that, when once emancipated, they shall be sent out of the United States, within twelve months after their emancipation,—and further prescribed, that the Police Juries of the several parishes, and the Common Council of New Orleans, before granting an emancipation, shall require of the owner or other person applying therefor, to deposit in the Parish Treasury of the parish in which the Act is made, or with the Mayor of the City of New Orleans, the sum of one hundred and fifty dollars for each slave to be emancipated, to be applied in payment of voyage to Africa and support after arrival. And further, by the second section of the Act it was declared, that claims for emancipation not yet perfected by the proper authorities shall not be granted, except upon the conditions just recited; and upon a failure to comply with those conditions, the slaves shall be hired out until the sum of one hundred and fifty dollars shall have been made, and so deposited, after which the emancipation may be perfected and the slaves sent to Liberia within one year. And in case every slave so emancipated should not be sent to Liberia within one year after his emancipation, or should return again after being sent, he shall forfeit his freedom and become the slave of his former owner, or revert to his legal representatives.

Next in order follows the Act of 1855, which was declared by this court to be in conflict with Article 118 of the State Constitution, and therefore unconstitutional. Now, what in effect is the law of the 6th of March, 1857, which declares that from and after its passage, no slave shall be emancipated in this State, but a repeal of the conditions of the first section of the Act of 1852, by a compliance with which emancipations of slaves could *then* be perfected. It is evident that the passage of the former law grew out of the inexecution of the latter, and was alone and exclusively designed by the Legislature to subserve the same end : to close the door for all time to come against the right of a *statu liberi* to perfect his emancipation in *this* State, and thus to remain and enjoy his freedom *here*.

The policy of both statutes was the same, and the object the same, progressively varying only in the rigor of the measures adopted the more effectually to suppress any further addition or accession to the free-colored population of the State. They, together with the entire antecedent legislation upon that subject, are strictly acts in *pari materia*, and according to the authorities, must be taken together and compared, in giving a construction to the Act under consideration. The object of the rule is to ascertain and carry into effect the intention of the Legislature, and it is laid down as a legal inference, that a code of " statutes relating to one subject was to be governed by one spirit and policy, and was intended to be consistent and harmonious in its several parts and provisions."

Applying these principles, elaborated here perhaps at too great length, to the questions involved in the present case, the following propositions, we think, may be safely and *conservatively* established by the court, without trenching upon the

DESHOTELS
v.
SOILEAU.

general power and dominion of the owner over his property, viz : That the authority of the master to manumit his slave is distinct from the emancipation of that slave, as shown by the obvious difference between the *status* and *capacity* of each : while one is subject to civil disabilities and held to service, the other is free from those disabilities and left to the untramelled enjoyment of his liberty. That the power to manumit does exist independently of any right to emancipate *here*. And finally, that the Act of the 6th of March, 1857, prohibitory of the exercise of the latter *within this State*, was never intended, nor can it be construed, consistently with the established rules of interpretation, to interdict the emancipation of a slave *beyond* her territorial limits, which could work no possible injury to her, and would in no wise be violative, either in letter or spirit, of existing laws.

Will this court then, give such an interpretation to the Act of 1857, as to take away or impair a remedy or the exercise of a right which had previously accrued and become vested ?

Such a construction would give a retrospective effect to that statute, a principle now universally reprobated.

A distinguished American Judge, in the leading case upon that subject, of *Dash* v. *Vankleeck*, 6th Johnson's Rep. 477, says :

" It is not pretended that we have any express constitutional provision on the subject ; nor have we for numerous other rights dear alike to freedom and to justice. An *expost facto law*, in the strict technical sense of the term, is usually understood to apply to criminal cases, and this is its meaning when used in the Constitution of the United States ; yet laws impairing previously acquired *civil* rights, are equally within the reason of that prohibition, and equally to be condemned. There is no distinction in principle, nor any recognized in practice, between a law punishing a person criminally, for a past innocent Act, or punishing him civilly by divesting him of a lawfully acquired right. The distinction consists only in the degree of oppression, and history teaches us that the government which can deliberately violate the one right, soon ceases to regard the other."

In the commentaries of the same learned jurist, he lays down this limitation to the general condemnation pronounced upon giving a retrospective effect to laws. That it may apply to remedial statutes, *provided* it does not impair or disturb absolute vested rights, and go to confirm rights already existing and in furtherance of the remedy, by curing defects and adding to the means of enforcing existing obligations. Kent's Com., vol. 1, p. —.

Would not the refusal of this court to decree the removal of these slaves by the present defendant, as ordered by the testator, disturb them in their vested rights ? Would such a refusal confirm them in these rights, and be in furtherance of their remedy ? And lastly, would such judicial action cure defects in the execution of those devises, or add to the means of enforcing obligations growing out of the right of the testator to make those testamentary dispositions. ?

Leaving these questions with the court, we now proceed, in the close of this argument, to notice the decisions of your Honors upon the effect to be given to the Act of 1857.

The case at bar presents no issue in its pleading, involving the right of the slaves to be emancipated *in this State*. The defendant, acting as dative executor, and charged in virtue of his office and duties with the execution of its devises, claims in defence, to have the *status* of these slaves defined and adjudged, and to be decreed by the court to remove them, with their consent, beyond the limits of this State, where their emancipation can be perfected, and where they will be protected by law in the quiet enjoyment of their liberty.

Two cases decided : *Delphine, f. w. c.*, v. *Guillet et al.*, unreported, and *Turner, Curator*, v. *Smith et al.*, reported in 12 An. 417, both brought to enforce emancipation within the State of Louisiana, and consequently decreed against as prohibited by the Act of 1857.

These cases, neither in their cause of action, or in the remedies sought, bear any affinity in point of fact or law to the case at bar, and, therefore, can offer no precedent to control the court in the decision of this cause.

*T. H. Lewis & Porter* and *A. Dejean*, for intervenors, argued :

*Adré Deshotels* died in April, 1855, without issue or forced heirs, leaving a last will and codicil, wherein, after making certain specific legacies, he bequeathed " the residue of his estate both personal and real, of every

description whatsoever, including slaves, lands, cattle, horses, hogs, sheep and movable property, to his nephew, *André Hildevert Deshotels* and *Marie Fidèle Soileau*, his wife, in equal portions, with the following condition, that they, the said *André Hildevert Deshotels* and his wife, *Marie Fidèle Soileau*, immediately after the death of testator, take such steps, as shall·be necessary, under the then existing laws of the State of Louisiana, to emancipate and set free the following slaves, to-wit," &c.

Testator further nominated and constituted *Eloi Vidrine*, of the above parish, his testamentary executor. Said will and codicil were admitted to probate and ordered to be executed, and the said *Eloi Nidrine* refusing to accept the testamentary executorship, *J. B. Soileau, fils*, one of the particular legatees, was appointed and duly qualified as dative testamentary executor.

On the 13th October, 1857, *Joseph Deshotels* and others, representing themselves as the legal heirs of the said *André Deshotels*, deceased, brought an action against the said *J. B. Soileau, fils*, individually, and not in his said capacity of dative testamentary executor, setting forth: "That the said *Soileau*, without any color of right or title to the said property, has taken possession of the estate aforesaid, and withholds it from the petitioners, who are legally entitled to the same, by virtue of their heirship aforesaid."

The petition concludes with a prayer, that petitioners be decreed to be the owners and proprietors of the estate of the said *André Deshotels*, consisting of lands, slaves, &c.; that the said *Soileau* be ordered to deliver the same to your petitioners, and condemned to pay to them five thousand dollars for the use and hire of said lands and slaves, &c., &c.

Defendant, for answer, denied generally the allegations in petition contained, and specially the heirship of plaintiffs.

For further answer, he represented that the said *André Deshotels*, deceased, had left a last will and codicil, which are valid and in due form of law; that said will and codicil were probated and ordered to be executed, and that respondent was appointed and duly qualified as dative testamentary executor thereof.

*André Hildevert Deshotels* and *Marie Fidèle Soileau*, his wife, as instituted heirs and legatees of the testator, intervened in the above suit, and set forth: " That *J. B. Soileau, fils*, the defendant, is the dative testamentary executor of the last will and testament of *André Deshotels*, deceased, and in such capacity he holds possession of the property claimed by plaintiffs. They also alleged the validity and legality of the will and codicil, and that it was the duty of said *Soileau*, as testamentary executor thereof, to see them faithfully executed."

They conclude with a prayer to be permitted to unite with the defendant in defending the validity of said will and codicil, and that they be declared universal legatees under said will and codicil, &c.

Upon these issues, parties went to trial, and the following judgment was rendered, in substance:

"That the claims of *Joseph Deshotels* and others, so far as said claims relate to the nullity of the testament, be rejected.

That *André Hildevert Deshotels* and *Marie Fidèle Soileau*, his wife, are universal legatees, under said will and codicil.

That the will and codicil be recognized as legal and valid.

That all the slaves to whom the deceased had bequeathed their liberty in said will, with the right to claim the same from the said legatees, be and are hereby decreed to be a part of the succession of said deceased, *André Deshotels*, and to be returned thereto, to be disposed of according to law, the statute of the 6th of March, 1857, having prohibited the emancipation of slaves in this State. The costs of suit to be paid by the estate of *Deshotels*."

From this judgment, *J. B. Soileau, fils*, the defendant, appealed.

The questions, we think, presented in this case for the decision of the court, are these:

1st. Is said will good and valid as a nuncupative will under private signature? If so,

2d. Have not the slaves therein emancipated an indefeasable and constitutional right to their liberty, notwithstanding the statute of the 6th of March, 1857, which was enacted subsequently to the probating of said will?

3d. Should the court be of opinion that the will is good and valid in form, but that said slaves cannot be emancipated, are not the intervenors, who are instituted heirs under the will, and to whom the residue of the estate is bequeathed, ·

95

DESHOTELS
*v.*
SOILEAU

also universal legatees, and as such, are not said slaves to revert to them, and not to the legal heirs?

Having conclusively shown, as we believe, that said will and codicil are good and valid in form, and that testator understood perfectly the dispositions thereof, we will briefly allude to the second proposition in order, to-wit: Have not the slaves therein emancipated an indefeasable right to their freedom, notwithstanding the statute of the 6th of March, 1857, which was enacted subsequently to the probating of said will?

Article 105 of the Constitution of the State of Louisiana, says: "No ex post facto law, nor any law impairing the obligation of contracts, shall be passed, nor vested rights be divested, unless for purposes of public utility, and for adequate compensation previously made."

As the will bequeathing to these slaves their liberty, was not only made, but was also probated and ordered to be executed previous to the passage of the aforesaid statute, had they not, therefore, a vested right to their freedom, which no subsequent legislation could constitutionally divest them of?

But should your honors be of the opinion, that said slaves are not entitled to their freedom or cannot be emancipated, are not intervenors, who are instituted heirs under the will, and to whom the residue of the estate is bequeathed, also universal legatees, and, as such are they not benefited by the lapsed legacies; that is, are not said slaves to revert to them and not to the heirs-at-law?

That they are universal legatees, we think there is little doubt. According to French commentators, whose interpretation of the civil law is considered high authority, they undoubtedly are universal legatees.

What says Toullier on this point? Book 3, tit. 2, art. 513, p. 487—" Si le testateur faisait d'abord un legs particulier et donnait ensuite *le surplus ou le res· tant de ses biens* à un autre légataire ; par exemple, je lègue à Sécundus le fonds Cornélien, et le surplus ou le restant de mes biens à Primus." *Ce dernier legs serait universel,* parce qu'il est sensé que je n'ai voulu restreindre le legs de tous mes biens que j'ai fait à Primus qu'en faveur de Sécundus, et dans le cas seulement ou celui-ci recueillerait son legs particulier."

This position is sustained in 3 An. 705, to-wit: " One to whom a testator bequeaths the residue of his estate after the payment of a particular legacy, is entitled. as universal legatee, to the possession of the estate of the deceased, when there are no heirs to whom any portion of the testator's property is reserved by law."

Now, if these intervenors are universal legatees, are they not benefited by the lapsed legacies, and do not these slaves revert to them and not to the heirs-at-law?

The doctrine of lapsed legacies or lapses, and the rights of universal legatees thereto, is very fully treated by the French commentators. Rogron, book 3, t. 2, p. 210, says: " Ce qui forme le caractère essentiel du legs universel *c'est le droit éventuel* qu'a le légataire à tout ce qui compose ou composera la succession ; il a, de plus, le privilège de continuer la personne du *défunt* et de le représenter comme ferait un héritier légitime."

Paillet, book 3, t. 2, p. 362, says : " Il est de principe que dans le cas de nullité ou de caducité des dispositions particulières, le legs universel profite de la nullité ou de la caducité."

Toullier, l. 3, t. 2, p. 484, says : That even when there is a forced heir, the universal legatee inherits by right of accretion, to the exclusion of said heir, the lapsed or repudiated legacies.

We could multiply quotations from the above authorities, in support of this point, but wish to be brief, and therefore forbear.

But passing over the question of lapses, of universal legatees and their rights, &c., &c., let us see what disposition the will has made of these slaves, should they not be emancipated. The testator, it seems, provided for this contingency. Let us read from the will, p. 21, 2d line : " I will, however, in the event my said slaves refusing to leave the State, should the laws of the State require this as a consideration of their emancipation, then I will them to my said nephew and niece, and discharge them from the conditions above, and only require them to have said slaves emancipated, whenever the laws of the State will permit them to remain in the State."

The above clause indicates clearly the intentions of the testator, as to the disposition to be made of these slaves should they not be emancipated. And we

contend that any other disposition of them would be a palpable violation of the expressed will of the testator.

Therefore, by the terms of said will, be they universal legatees or not, they are entitled to said slaves should they not be emancipated.

BUCHANAN, J.   Upon the questions of fact relating to the formalities required by law for the confection of a nuncupative testament under private signature, having been observed in the present instance, we concur in the conclusions of the District Judge, from the voluminous, and to some extent, contradictory testimony before him.

The will of *André Deshotels* is valid in form, and has been duly probated.

Several questions of law are presented to us, upon the following clause of that will :

"Fourth.   I will and bequeathed unto my nephew, *André Hildevert Deshotels*, and to his wife, *Marie Fidèle Soileau*, in equal portions, all the residue of my estate, both personal and real, of every description whatever, including slaves, lands, cattle, horses, hogs, sheep, and movables.   This bequest is given and made with the following conditions, that is to say : that they, the said *André Hildevert Deshotels*, and his wife, *Marie Fidèle Soileau*, immediately after my death, take such steps as shall be necessary, under the then existing laws of the State of Louisiana, to emancipate and set free the following slaves, to-wit, *Harriet, Louise, Hyacinthe, Lucy, Jean Pierre, Eliza, Pauline, Coralie, Louison, Aimie, Jean Batiste, Valmont* and *Louisa*, upon such terms as will permit them to remain in the State of Louisiana ; and should this not be permitted by the laws, then they shall have them emancipated, and furnish each one of the said slaves with one hundred and fifty dollars, to remove them from the State of Louisiana.   And upon the further condition, that the said legatees shall, during the time from the date of my death and the emancipation of my slaves, furnish them all necessary food and clothing, and treat them with kindness and humanity : and on their failure to comply with the above conditions, this legacy is to become null and void, so far as the said *André H. Deshotels* and *Marie Fidèle Soileau* are concerned.   And in order fully to carry out this provision of my will, I give and bequeath unto my said slaves their liberty, with the right to claim the same from my said legatees, immediately after my death.   I will, however, in the event my said slaves refusing to leave the State, should the laws of the State require this as a consideration of their emancipation, then I will them to my said nephew and neice, and discharge them from the conditions above, and only require them to have said slaves emancipated, whenever the law of the State will permit them to remain in the State."

And in a codicil, there is a similar testamentary disposition in relation to a slave named *Marie*.

The heirs-at-law of *André Deshotels* contend, that the legacy of freedom to the several slaves named in these clauses of his will and codicil, has lapsed, from the incapacity of the legatees to receive, (C. C. 1696,) the emancipation of those slaves being now a legal impossibility, under the provisions of the statute of the 6th of March, 1857. Session Acts, p. 55.

On the part of the executor, it is contended that the right of the slaves to their freedom, became vested and indefeasible, upon the death of the testator, which took place on the 6th of April, 1855, about two years previous to the passage of the Act of the Legislature in question : and that it would be contrary to the 105th Article of the State Constitution, to give to that statute the effect of defeating a right thus vested.

The operation of the Act of 6th of March, 1857, has been considered by us in various cases, commencing with that of *Delphine* v. *Guillet*. The constitutional view of the subject now presented, was lately considered by us in several cases decided during the last spring in New Orleans—the cases of the *Succession of Baker Woodruff*, and that of *Johnson* v. *Johnson*. The same point was raised in the case of slave *Minnie and others* v. *John Ray, Executor*, lately decided at Monroe. We then held, and we adhere to the doctrine, that the right of a slave to freedom under the will of his master, was not vested, until the formalities required by law for consummating the emancipation had been complied with.

· The right of the owner of a slave to give the slave his freedom, was always a qualified right in Louisiana, subject to the action of the constituted authorities, and by the Act of the 6th of March, 1857, the right, qualified as it was before, has been annihilated. Dating from the passage of that Act, we understand the policy of this State to be, that the slaves within her borders shall remain slaves. In this, there is nothing unconstitutional.

The Legislature has not pretended to say, that those who were formerly slaves, and who, having been solemnly emancipated with all the forms of law, have become free, shall returnin to slavery. It has merely rendered it impracticable for the future, to consummate the emancipation of a slave, by withholding that sanction which was always necessary to the consumation of emancipation.

And the last will now under consideration, affords internal evidence that the testator was aware of his inability to give complete and perfect freedom to his slaves, and desired to provide against every legal contingency that might occur, to prevent the accomplishment of the object which he had in view. For,

First. He devises these slaves, with other property, to certain persons, on condition that the devisees shall take the necessary legal steps to have the slaves emancipated, with permission to remain in the State.

Secondly. On condition, (in case the law will not permit the slaves, when enfranchised, to remain in the State,) that the devisees shall have them emancipated, with the obligation to remove from the State, and shall furnish the slaves with necessaries funds to operate such removal.

Thirdly. For fear the devisees should disregard the preceding conditions of the devise, the testator gives to these slaves the right to sue the devisees for their freedom, immediately after the death of testator ; and,

Fourthly. Should it ever happen that the slaves themselves would refuse to accept the boon of liberty, coupled with the obligation to remove from the State, the testator makes a special devise of the slaves to certain persons, *upon trust.* that the devisees will have the slaves emancipated, whenever the law shall be so changed, as to permit them to remain in the State after enfranchisement.

The whole of this complicated machinery has been constructed with reference to the peculiar legislation on this subject, as it existed when the will was made, and the modifications which that legislation might undergo thereafter. One contingency alone was omitted ; that the Legislature should think proper to take away the power of emancipation altogether. This contingency has happened ; and the will has made no provision for such a case. The special devise of the slaves to the nephew and neice of the testator, has no application nor effect to this state of the case, because it is only made in event, that the negroes should refuse to leave the State as a legal condition of their emancipation.

It is argued by the able counsel for the testamentary executor, that the will has conferred upon his client, the power which the testator might unquestionably

have exercised in his lifetime, of taking the slaves in question out of the State. But we do not so understand the clause referred to, and which we have copied above.

The *residuary legatees* are directed, in a certain contingency, to remove the slaves from the State, *after having had them emancipated.* This is a very different thing from authorizing *the executor* to remove the slaves *without being emancipated.*

The only question which remains to be considered, is one raised by the intervenors, the residuary legatees, namely : that the legacies of freedom to the slaves named in the will, having lapsed, to whom do the said slaves belong—to the residuary legatees, or to the heirs-at-law ? This question is settled in favor of the heirs-at-law, by the decision in *Turner* v. *Smith,* 12 An., which affirmed the doctrine of the case of *Compton* v. *Prescott,* 12 Rob ; also, case of *Josephine Lewis* v. *Heirs of Williams,* lately decided at Alexandria.

It is, therefore, adjudged and decreed, that the judgment of the District Court be amended ; that the will and codicil of *André Deshotels,* admitted to probate and execution by decree of the District Court of St. Landry, be recognized as valid in form ; that the defendant, *Jean Baptiste Soileau,* as testamentary executor of said last will and codicil, do account to plaintiffs, as heirs-at-law, and to intervenors, as residuary legatees of said *André Deshotels ;* that the legacy of their freedom, to the several slaves named in the last will and codicil, be declared to have failed ; and the said slaves to be the property of plaintiffs, in the proportions in which they are severally heirs-at-law of the testator. It is lastly decreed, that the costs of this suit, in both courts, be borne by the succession of *André Deshotels.*