## BOTTS *v.* COCHRANE.

The liability of the owners of any ship, vessel, or other water craft to the owner of any slave illegally carried from one part of the State to another, under the stat. of 26 March, 1835, only exists where the master of the vessel would be subject to the pains and penalties of the stat. of 13 February, 1816.

The duty, imposed by the stat. of 13 February, 1816, on the master of a vessel who discovers a fugitive slave on board, to land him at the nearest place, is substantially obeyed by landing him at the nearest place where he can be landed with reasonable facility, and in such a mode as may be best calculated to ensure his safe keeping. It would be unreasonable to require a captain to stop in the night, and to go on shore in search for a justice or other inhabitant, when, by proceeding on his voyage till daylight he could reach a principal town of the State, where he might provide for the safety of the slave, and give publicity to his elopement.

APPEAL from the Fifth District Court of New Orleans, *Buchanan*, J. *Preston*, for the appellant. *Michel* and *Burns*, for the defendant. The judgment of the court was pronounced by

SLIDELL, J. A slave belonging to the plaintiff ran away from him, and secreted himself on board of the defendant's steamer, then about leaving the city on a voyage up the river. The boat left New Orleans in the afternoon, and sometime in the evening the slave was discovered by the mate. Early the next morning the boat arrived at Baton Rouge, when the slave, who had been confined during the whole night, was placed in charge of the wharf-master, who had him put in jail there, and advertized as a runaway. All the intermediate jails were passed in the night time. The plaintiff recovered his slave about four months afterwards, receiving him from the jailor at Baton Rouge; and brought this action to recover from the defendant the expenses incurred in searching for and regaining possession of the slave, and the value of the slave's time at two dollars per day.

This claim the plaintiff attempts to maintain under the statutes of 1816 and 1835. The act of 1816 imposed, by its first section, the penalty of imprisonment at hard labor for a term not exceeding seven years and not less than three, and a liability for all damages to the proprietor, upon masters of vessels who should, without the consent of the owner, carry a slave out of the State, or receive him on board with that intent, or conceal him for the purpose of enabling him to make his escape. By the fifth section it was enacted that, if a master should discover a slave concealed on board his vessel, it should be his duty, if still in the river, or within the limits of the State, to land the slave at the nearest place—*au lieu le plus prochain,* and there to deliver him to any

<div style="margin-left:2em;">

</div>

judge, justice of the peace, sheriff, jailor, or, in defect thereof, to any inhabitant, that he may be sent to his master; and that any master refusing or neglecting to perform what was required in the section should be liable to the same punishment, and the damages mentioned in the first section. By the act of 1835, the liability in damages was extended to the owner of the vessel, for the acts and omissions of the master contemplated in the act of 1816.

As the liability of the owner only accrues in cases where the master would be subjected to the pains and penalties of the act of 1816, we will examine the effect of the statute, as though the steamer's captain were under prosecution, under the fifth section of the act of 1816. If he could not be subjected to imprisonment at hard labor for a term of three years, the vessel's owner cannot be made liable in this suit.

The statute is highly penal, and is not to be harshly construed. It must receive a reasonable construction, such as will accord with the intention of the legislature. That intention was the protection of the slave owner, and the accomplishment of the restoration of fugitives. The injunction upon the master of the vessel who discovers a fugitive slave on board to land him at the nearest place, is, we think, substantially obeyed by landing him at the nearest place where it can be done with reasonable facility, and in such mode as may be best calculated to ensure his safe custody. It seems to us it would be unreasonable to require the captain to stop in the night, no matter where it might be, and go on shore to search for a justice or an inhabitant, when, by proceeding on his voyage until day-light, he would reach a principal town of the State, where he would be sure to find the means of providing for the safe keeping of the slave, and giving publicity to his elopement. We cannot resist the conviction that the captain acted in good faith, and, in the exercise of a sound judgment, under the circumstances, for the protection of the owner. No jury, we conceive, would find a verdict upon an indictment against a captain upon such facts; nor do we think a court could properly instruct them that it would be their duty so to find.          *Judgment affirmed.*