PROYOSTY, J.
The indictment in this case charges that one of the defendants is a person of Caucasian or white race, and the other “a person of the negro or Mack race, to wit, an octoroon,” and that they “did cohabit together and live in concubinage,” in violation of section 1 of Act No. 87 of 1908, which reads as follows:
‘'Section 1. Be it enacted by the General Assembly of the state of Louisiana, that concubinage' between a person of the Caucasian or white race and a person of the negro or black race is hereby made a felony, and whoever shall be convicted thereof in any court of competent jurisdiction shall for each offense be sentenced to imprisonment at the discretion of the court-for a term of not less than one month nor more than one year with or without hard labor.”
The sole question is whether an octoroon is “a person of the negro or black race” within the meaning of this statute.
Scientifically, or ethnologically, a person is Caucasian or negro in the same proportion in which the two strains of blood are mixed in his veins; and therefore scientifically, or ethnologically, a person with seven-eighths white blood in his veins and one-eighth negro blood is seven-eighths white and one-eighth negro. But the words of a statute are not to be understood in their technical, but in their popular, sense, and the prosecution contends that the popular meaning of the word “negro” includes an octoroon.
The dictionaries are the exponents of the popular meaning of the words of the language. If we consult them, we find that the word “negro” does not include an octoroon within its meaning.
Webster’s International Dictionary, definition of word “negro”:
“Negro. A black man, especially, one of a race of black or very dark persons who inhabit the greater part of tropical Africa, and are distinguished by crisped or curly hair, flat noses, and thick protruding lips; also, any black person of unmixed African blood, wherever found.”
Id., definition of word “colored”:
“Colored.. (Ethnologically) Of some other color than white; specifically applied to ne-groes or persons having negro blood; as, a ‘colored man’; the ‘colored’ people.”
Century Dictionary, p. 3960, definition of word “negro”:
“A black man; specifically, one of a race of men characterized by a black skin and hair of a woolly or crisp nature. Negroes are distinguished from the other races by various other peculiarities — such as the projection of the visage of the forehead; the prolongation of the upper and lower jaws; the small facial angle; the flatness of the forehead and of the hinder part of the head; the short, broad, and flat nose; and the thick projecting lips. The negro race is generally regarded as comprehending the native inhabitants of Sudan, Senegambia, and the region southward to the vicinity of the equator and the great lakes, and their descendants in America and elsewhere; in a wider sense it is used to comprise also many other tribes further south, as the Zulus and Kafirs. The word ‘negro’ is often loosely applied to other dark or black-skinned races, and to mixed breeds.”
Id., definition of the word “colored,” p. 1111:
“Having a dark or black color of the skin; black or mulatto; specifically, in the United States, belonging wholly or partly to the African race; having or partaking of the color of the negro.”
29 Cyc. p. 661, definition of word “negro”:
“A black man descended from the black race of South Africa.”
*303 Id., definition of word “colored”:
“Not a phrase of art, but often applied to black people, Africans, or their descendants, mixed or unmixed; persons of African descent or negro blood; persons of the negro race; persons who have any perceptible admixture of African blood.”
A. & E. E. of Law, p. 213, definition of “colored people”:
“ ‘Colored’ or. black people, African or their descendants, mixed or unmixed.”
In Zell’s Encyclopaedia, “negro” is defined as follows:
“A name properly applied to a race or variety of the human species, inhabiting the central portion of Africa, principally between the latitudes 10 degrees north and 20 degrees south, on account of some of their striking characteristics— their black color. They do not include Egyptians, Nubians, Abyssinians, etc., of the North, or Hottentots of the South African. Their characteristics are: Skin black, hair woolly, lips thick, nose depressed, jaws protruding, forehead retiring, proportions of the extremities abnormal.”
7 Encyclopaedia Britannica, p. 316, and also 7 Americanized Encyelopse&ia Britannica, p. 4416, defines the word “negro” as follows:
“Distinctly dark, as opposed to the fair, yellow, and brown varieties of mankind. The negro dominion originally comprised all Africa south of the Sahara; negro, members of the dark race whose original home is in the inter-tropical and subtropical regions of the Eastern hemisphere.”
Webster’s Dictionary (Thompson & Thompson Ed. 1907) p. 747, describes “negro” as follows:
“A native or descendant of the black race of men in Africa. The name is never employed to the tawny or olive-colored natives of the northern coast of Africa, but to the most southern race of man, who is quite black.”
Standard Dictionary, definition of word “colored”:
“Of a dark-skinned or non-Caucasian race; specifically, in the United States, of Afincan descent, wholly or in part. Originally the epithet was applied only to those of mixed blood, making three classes of inhabitants — white, black, and colored.”
Id., definition of word “negro”:
“One belonging to the Ulotrichi or woolly-haired type of mankind; a black man, especially of African blood, and particularly one belonging to the stock of Senegambia, Upper Guinea, and the Sudan. In North 'Carolina a person who has in his veins one-sixteenth or more of African blood.”
For what it here says is the case in North Carolina the Standard gives as its authority the decision of the Supreme Court of that state in the case of State v. Chavers, 50 N. C. 11; but a perusal of that decision reveals that in it the court has not undertaken to declare what was the popular meaning of the word “negro” in that state, but has simply applied or enforced the following statute:
“All free persons descended from negro ancestors to the fourth generation inclusive, though one ancestor in each generation may have been a white person, shall be deemed free negroes and persons of mixed blood.”
This was not to hold that in North Carolina the word “negro,” as popularly understood, includes within its meaning a person having i5/1G of white blood and only Vic of negro blood in his veins, but that such a person was a negro according to said statute. Of course, where a statute has defined the meaning of a word, the definition is authoritative. If the statute we are dealing with, or any other statute of this state, had defined the word “negro” as including a person of mixed blood, there would be an end of all question. But the contention of the prosecution is that the word does not need to be defined in a statute; that popularly it has a definite, well-known meaning; and that in this popular acceptation it includes all persons having in their veins a perceptible admixture of negro blood. In support of that contention, opposed as it is to the dictionaries of the language, universally accepted as the reliable exponents of the meaning of the words of the language, there is adduced absolutely nothing. The learned district attorney appeals to some knowledge of *305 the popular meaning of the word “negro” which the judges of this court are supposed to be possessed of, derived outside of the dictionaries of the language. Apart from the dictionaries, the only source from which can be derived information as to the meaning of words is the literature of the language, including in that literature the evanescent newspaper writings of the day. Now no literature, whether of the permanent or evanescent kind, has been called to the attention of the court in which the word “negro” or the term “a person of the negro race” has been given a meaning which would include an octoroon; and, still less, a person of 15/ie white and Vi6 negro blood, or s1/32 white blood to 1/32 negro 'blood. If -this court were to declare that the popular meaning of the word “negro” embraces octoroons, the decision would furnish the one solitary instance in legal or any other literature where the word had been given that meaning. The judges of this court do not know that the word has that meaning. The learned trial judge did not think it had; and we are informed that his colleague on the criminal district court bench, Judge Baker, than whom no man in this state, we dare say, has had a wider experience in the trial of criminal cases, was of the same opinion.
There is a word in the English language which does express the meaning of a person of mixed negro and other blood, which has been coined for the very purpose of expressing that meaning, and because the word “negro” was known not to express it, and the need of a ' word to express it made itself imperatively felt. That word is the word “colored.” The word “colored,” when used to designate the race of a person, is unmistakable, at least in the United States. It means a person of negro blood pure or mixed; and the term applies no matter what may be the proportions of the admixture, so long as the negro blood is traceable. Lee v. New Orleans Great Northern Railway Co., 125 La. 236, 51 South. 182. In our Constitution and laws, when it has become necessary to use a word comprehending within its meaning both negroes, properly so-called, and persons of mixed negro blood, the term “colored” has invariably been used. Thus the Civil Code of 1838 (articles 95 and 2201) made null all marriages between whites and “free people of color.” The same language was used in Act No. 308 of 1855. In article 284 of our present Constitution, the expression is: “There shall be free public schools for the white and colored races.” And so in our numerous public schools statutes. The “Jim Crow” railroad law (Act No. Ill of 1890, p. 152) requires the railroads to provide equal but separate accommodations for the “white and colored races.” The “Jim Crow” street railways law (Act No. 64 of 1902, p. 89) requires that the street railways shall provide equal but separate accommodations “for the white and colored races.” The miscegenation law (Act No. 54 of 1894, p. 63) provides that “marriage between white persons and persons of color is prohibited.” The act of June 7, 1806 (1 Lislet’s Dig. p. 498), entitled, “An act to prevent the introduction of free persons of color,” etc., uses the expression “persons of color” throughout. The act of April 14,1807 (1 Lislet’s Dig. p. 499), entitled “An act to prevent the immigration of free negroes and mulattoes," etc., uses the expressions “negroes and mulattoes” and “free persons of color” throughout. The act of March 31, 1808 (1 Lislet’s Dig. p. 499), requires notaries passing acts in which “free persons of color may be concerned” to add “after the name and surname of such free persons of color,” these words: “free man or free woman of color.” The act of March 16, 1830 (Laws 1830, p. 90), entitled “An act to prevent free persons of color from entering the state,” etc., uses the expression “negroes, mulattoes or other free persons of *307 color” throughout, repeating that expression several times in 12 of its 17 sections. The act of March 25, 1831 (Laws 1831, p. 78), uses the same expression “free negroes,' mulattoes or other persons of color.” The title of Bul-lard & Curry’s Digest, relating to negroes, griffs, mulattoes, etc., is not “of negroes,” hut is “of colored persons.” Act June 7, 1S06 (1 Martin’s Dig. p. 608), relating to slaves, is entitled “An act prescribing the rules,” etc., with respect to “negroes and other slaves.” (N. B. Other slaves here could only mean descendants of negroes, because there was no other kind of slaves.) In its section 40 this act uses the expression “free persons of color.” The act of same date relative to the crimes of slaves, “free negro, mulatto or mustee” (Act March 20, 1809 [1 Martin’s Dig. p. 664]) uses expression “negroes and other slaves.” So likewise the act supplementary thereto of March 23, 1810 (1 Martin’s Dig. p. 668). Act of this latter date “concerning the introduction of certain slaves,” etc., uses the expression “that a slave, whether negro, mulatto or person of color.” The act of March 19, 1816 (1 Martin’s Dig. p. OSO), is relative to “negroes and other slaves,” and speaks of the capture of runaway negroes or slaves, and of any free person of color.” The act of February 16, 1818 (Laws 1818, p. 18), uses the expression “negroes and other slaves.” Act March 16, 1330 (Laws 1830, p. 90), uses the expression “free persons of color.” The Revised Statutes of 1852 (pages 284-290) contains the title “free persons of color.” It embodies the entire existing legislation at that time in force relative to said title. Some of the acts already hereinabove referred to are reproduced, and, in addition, Acts 1825, p. 132, Acts 1830, p. 90, Acts 1831, p. 98, Acts 1842, p. 308, Acts 1843, p. 45, Acts 1846, p. 163, and Acts 1850, p. 179. A perusal will show that throughout, both in the text and in the marginal notes, the expressions used are “persons of color” or “negroes, mulattoes, or other free persons of color.” See same book, title “Slaves” (pages 522-557), where the term “person of color” is constantly used to designated persons of mixed negro blood, and never the unqualified word “negro.” What is here said of the Revised Statutes of 1852 is equally true of the Revised Statutes of 1856. Therefore, if the word- “negro” as used in the act now in question and in the Gay-Shattuck act, so called (Act No. 176, p. 236, 1908), of the same Legislature of 1908, was intended to have a meaning synonymous with “colored,” this use of the word must 'be looked upon as a clean and clear departure from the customary mode of designating persons of mixed negro blood.
And, if we refer to the legislation of our sister states, we find the same uniformity in the use of the word “colored,” and not “negro,” where the intention is to designate not exclusively the negro, or black man, but also the mulatto and others of mixed negro blood. And we find that, except in those states where a definition of the word “negro” is given-once for all in the Code or General Statutes (as, for instance, Pol. Code Ala. 1907, § 2; Gen. St. Fla. 1906, p. 165, § 1), the word is not used as convertible with “colored,” unless there is added at once some word enlarging its ordinary meaning. Thus:
In Maryland the word “colored” is used throughout in Code Pub. Gen. Laws 1904, book 1, xjp. 892, 893, on subject of railroads; page 939, on the subject of house of reformation ; book 2, pp. 1745-49, on the subject of schools; and the word “negro” is used, but with a definition added, in book 1, p. 877, on the subject of marriage. See, also, 1 Pub. Gen. Laws Md. p. 200, where the expression “negro or of negro descent” is used.
In South Carolina the Constitution of 1895 (article 3, § 33) reads:
“The marriage of a white person with a negro, or mulatto, or person who shall have one-eighth or more negro blood,” etc.
*309 And 1 Civ. Code, art. 5, §§ 1293-1290 (Agricultural Schools), uses the word “colored” •throughout, and section 2664, volume 1, on the subject of marriage, uses the words •“negro or mulatto.” And the public school acts use the words “colored” or “colored races.”
In Tennessee, the Code of 1884, on the subject of schools (section 1208, art. 9), hospitals (section 2071, art. 6), deaf and dumb institutes (section 2098, art. 6), railroads (section 2304), uses the word “colored” throughout — and on the subject of marriages (section 3291) uses the words “negroes, mulattoes, or persons of mixed blood, descended,” etc. Same in the «Constitution of 1870.
In Florida, Gen. St. 1906, §§ 3529-3533, on ■the subject of miscegenation, uses the words “negro or mulatto.” Section 1, p. 165, declares that “the term ‘negro’ shall include every person having one-eighth or more of negro blood.” The Constitution on the subject of schools (article 12, § 12) uses the word “colored.” On the subject of marriage (article 16, § 24) it uses the expression “negro or negro descent.”
In Georgia, 2 Oiv. Code 1895, art. 3, § 1820, provides that:
“All negroes, mulattoes and their descendants having one-eighth negro or African blood in their veins shall be lmown in this .state as persons of color.”
Const, art. 8, § 5906, on the subject of .■schools, uses the term “colored.”
In Mississippi, Code 1906, § 3244, on the subject of marriage, uses the expression “negro or mulatto, or persons who shall have •one-eighth or more negro blood. Sections 4059, 4060, on the subject of railroads, uses the term “colored” throughout; and so does the Constitution of 1890 on the subject of schools (section 207).
In West Virginia the Code of 1906 uses the word “colored” throughout. Thus section 1763 et seq., on the subject of colored institutes; section 1589 et seq., on the subject of schools; sections 4359, 4360, on the subject of miscegenation. And so does Const, art. 12, I 8 (Code 1906, p. lxxxiii), on the subject of schools; sections 2889 and 2909, on the subject of marriage.
In Alabama, the Constitution, forbidding marriages, uses the expression “negro or descendant of a negro.” Const. 1901, § 102. The Political Code, as already stated, defines the word “negro.” In the legislation of the state generally the word “colored” is used thus. Const. § 258, on the subject of schools; Code, § 5487, on the subject of railroads, etc.
In North Carolina, the Code (section 1084, p. 437) provides that “all marriages between a white person and a person of negro descent to the third generation are void.” The legislation of the state in other connections uses the word “colored.”
In Virginia, the word “colored” is used throughout, except that, in prohibiting marriages, Code 1873 (Code 1887 not in library) p. 1208, c. 192, § 8, uses the word “negro.” There is a statute in Virginia providing that “every person having one-fourth or more of negro blood shall be deemed a colored person.” In McPherson v. Commonwealth, 28 Grat. 939, the Supreme Court of Virginia held that a person having less than one-fourth of negro blood was not a negro. To the same effect Jones v. Commonwealth, SO Va. 538-542. The court was interpreting the first of the above-quoted statutes in connection with the second; and assumed that the word “negro” was convertible with “colored.” We are not prepared to say that the second of the said statutes does not have the effect of making the two terms completely synonymous in Virginia.
In Kentucky, the statute with reference to marriage (Rev. St. 1894, §§ 2097, 2098) uses the expression “negro or mulatto,” and adds that:
“Those shall be deemed negroes and mulattoes who are of pure negro blood, and those descended from a negro to the third generation inclusive.”
*311 See Laws Ky. 1865-60, c. 550, § 3. Const. 1891, § 187, on the subject of schools, and Rev. St., on same subject, pp. 1448-1452, use the word “colored” throughout.
In Missouri, Laws 1804-, p. 07, there is a statute defining the term “negro” and “mulatto.”
Also in Arkansas, Kirby’s Dig. 1904, § 6032, p. 1378, provides a statutory definition.
The laws of Oklahoma are not in the state library.
Nothing' is to be found on the subject in the laws of Kansas or the District of Columbia.
In Texas, the word “colored” is used generally, except in the law forbidding marriages, where the expression “African and persons of African descent” is used. And the word is defined by statute. Rev. St. 1895, art. 3908. And in the separate car law the word “negro” is used.
Passing to the other states, we find that in New York the'words “colored” and “of African descent” are used. 1 Rev. St. (Birdseye 2d Ed.) tit. “Schools,” p. 572, art. 11; vol. 2, Id. (Insurance) p. 1092, § 319, par. 4.
So in Massachusetts, Rev. Laws (Schools) p. 478; (Kidnapping) p. 1746; “negro, mulatto, or other persons of color.”
In Indiana, Burns’ Ann. St. 1908, § 2641, marriage is prohibited between “white persons and persons having one-eighth1 or more negro blood.” Elsewhere, the expressions are “negro or mulatto” (Const, art. 1, § 82; 2 Burns’ Ann. St. 1908, p. 237) and “colored” (2 Burns’ Ann. St. 1908, pp. 361, 1175).
In Ohio, the terms used are “colored,” “wholly or partially of African descent,” “persons of color.” 2 Rev. St. §§ 3031 — 1, 3031 — 2.
In Arizona, Rev. St. p. 809, art. 3092, forbids marriage between white and “negro or descendant of negro.”
In Nebraska, Cobbey’s Ann. St. 1907, § 4275. forbids marriage between white and persons “possessed of one-fourth or more of negro blood.”
In Nevada, Comp. Laws, § 4853, subsec. 3, p. 944, forbids illicit cohabitation between white and “any black person, mulatto, Indian or Chinese.”
In Illinois, the word “colored” is used throughout. Const, art. 8 (Schools); Act March 24, 1874 (Rev. St. 1S74, c. 122, § 100).
In Montana, Laws 1909, c. 49, p. 57, prohibiting marriages, uses the expression “ne-groes and persons 'of negro blood.”
In Michigan, 1-Iow. Ann. St. 1882, par. 0214, p. 1019, on subject of marriages, uses expression “wholly or in part of African descent.” The Constitution (Schools) uses word “colored.”
The foregoing review of the laws of the other states is, we realize, very imperfect and superficial; but it suffices to show that the word “negro,” very far from having been generally recognized and accepted as including within its meaning persons of mixed negro blood, «has, on the contrary, never been so used, unless coupled with defining words, or with a definition statutorily elsewhere adopted, except perhaps in Virginia. We say “perhaps,” because there is in Virginia a statute which may be said to- impart that meaning to the word.
If we pass from statutory literature and come to judicial literature, we find the same approximate uniformity in the use of the word “colored” whenever the idea is to refer to ijersons in general having negro blood; and the use of the word “negro” unqualified only when the reference is to the negro properly so called, or blacks. Thus in the first of our volume of reports (1 Mart. [O. S.j 184, the case of Adelle v. Beauregard), the syllabus reads:
“Persons of color are presumed free — negroes otherwise.”
A sharp distinction is here drawn between persons of color and negroes proper or blacks. In the following cases the word “colored” is used throughout to designate negroes proper and persons of mixed negro hlood: Ex parte *313 Plessy, 45 La. Ann. 80, 11 South. 948, 18 L. R. A. 639 (a railroad case); Decuir v. Benson, 27 La. Ann. 1 (a steamboat case); Same case on appeal to Supreme Court of U. S. (Hall v. De Cuir) 95 U. S. 485, 24 L. Ed. 547; State ex rel. v. Judge, 44 La. Ann. 770, 11 South. 74 (a railroad case); State v. Pearson, 110 La. 387, 34 South. 575 (a street car case); Lange v. Richoux, 6 La. 560; Robinett v. Verdun’s Vendees, 14 La. 542; Compton v. Prescott, 12 Rob. 50; Badillo v. Tio, 6 La. Ann 129; Succession of Hebert, 33 La. Ann. 1099; Succession of Vance, 110 La. 760, 34 South. 767; Cazanave v. Bingaman, 21 La. Ann. 435; Succession of Colwell, 34 La. Ann. 265; Jung v. Doriocourt, 4 La. 175; Holmes v. Holmes, 6 La. 470, 26 Am. Dec. 482; Succession of Pearce, 30 La. Ann. 1169; The Sue (D. C.) 22 Fed. 843; Louisville, N. O. & T. R. Co. v. Mississippi, 66 Miss. 662, 6 South. '203, 5 L. R. A. 132, 14 Am. St. Rep. 599; Logwood v. Memphis, etc., Co. (C. C.) 23 Fed. 318; Murphy v. Western, etc., R. R. (C. C.) 23 Fed. 637; State ex rel. Games v. McCann, 21 Ohio St. 198; People ex rel. v. Gallagher, 93 N. V. 438, 45 Am. Rep. 232; Roberts v. City of Boston, 5 Cush. (Mass.) 198.
In C., O. & S. R. R. Co. v. Wells, 85 Tenn. 613, 4 S. W. 5, a railroad passenger case, the plaintiff was a mulatto, and the court used the word “mulatto” throughout, except when referring to the “colored” porter.
In Lee v. Hill, 83 Ky. 49, the word “negro” u;as used; but whether for the purpose of designating the negro proper, or also the person of mixed negro blood, cannot be ascertained from the decision.
In Cory v. Carter, 48 Ind. 327, 17 Am. Rep. 738, the term “negro” was used, but the plaintiff and his children were negroes of the full blood; hence the word “negro” was the appropriate term to use in the case. Where, however, the schools act is referred to and the school children, the word “colored” is used.
In State ex rel. Stoutmeyer v. Duffy, 7 Nev. 342, 8 Am. Rep. 713, the word “negro” occurs both in the syllabus and in the decision; but the court was dealing with a statute which read: “Negroes, Mongolians and Indians shall not be admitted into the public schools.”
In Westchester, etc., R. R. v. Miles, 55 Pa. 209, 93 Am. Dec. 744, the court seems to have used the words “negroes” and “black” con-vertibly with “colored.” The case, however, in no way involved the meaning of these terms; but dealt exclusively with the right to provide separate accommodation for the races on the cars of the plaintiff company.
In Ward v. Flood, 48 Cal. 36, 17 Am. Rep. 405, the words of the statute were “of African descent” and “colored.” Nowhere “negro” unqualified.
The cases in the following long list involved slaves, rights to slaves, rights claimed by slaves, suits for freedom, incapacity to inherit resulting from the impossibility of whites and persons of color to marry, etc. In not one of these cases is the word “negro” used as including mulattoes, and still less quadroons, etc. Where the -word “negro” is used it is with the meaning of a black person. Not necessarily a pure blooded African; but a black person. The word “colored” is used with the same freedom as if its meaning, as expressing a person having negro blood in his veins, were no more uncertain than is the meaning of the word “horse” or “man.” Merry v. Chexnaider, 8 Mart. (N. S.) 699 ; Gomez v. Bonneval, 6 Mart. (O. S.) 656; Cuffy v. Castillon, 5 Mart. (O. S.) 496; Metayer v. Metayer, 6 Mart. (O. S.) 16; Metayer v. Noret, 5 Mart. (O. S.) 566; Forsyth v. Nash, 4 Mart. (O. S.) 385; Brown v. Compton, 10 Mart. (O. S.) 425; Simmins v. Parker, 4 Mart. (N. S.) 203; Hawkins v. Vanwinckle, 6 Mart. (N. S.) 420; Girod v. Lewis, 6 Mart. (O. S.) 559; Livaudais’ Heirs v. Fon, 8 Mart. (O. S.) 161; Allain v. Young, 9 Mart. (O. S.) 221; Delery v. Mornet, 11 Mart. (O. S.) 10; *315 Morgan’s Syndics v. Fiveash, 8 Mart. (N. S.) 590; Labranche v. Watkins, 4 Mart. (O. S.) 391; Palfrey v. Rivas, 7 Mart. (O. S.) 371; Morgan v. Mitchell, 3 Mart. (N. S.) 576; Catin v. D’Orgensy’s Heirs, 8 Mart. (O. S.) 219; Moosa v. Allain, 4 Mart. (N. S.) 102; Louis v. Cabarrus, 7 La. 172; Prudence v. Bermodi, 1 La. 241; Poulard v. Delamare, 12 La. 267; Smith v. Smith, 13 La. 446; Poydras v. Taylor, 18 La. 12; Mary v. Morris, 7 La. 139; Marie Louise v. Marot, 8 La. 479; Phillis v. Gentin, 9 La. 211; Grounx v. Abat’s Ex’rs, 7 La. 31; Poydras v. Monrain, 9 La. 505; Markham v. Close, 2 La. 584; Moffat v. Vion, 5 La. 347; Hart v. St. Romes, 7 La. 589 ; Guerrier v. Lembeth, 9 La. 341; Hurst v. Wallace, 5 La. 99; Strawbridge v. Turner, 9 La. 215; Rice v. Cade, 10 La. 295; Goldenbow v. Wright, 13 La. 373; Buel v. New York Steamer, 17 La. 546; Valsain v. Cloutier, 3 La. 176, 22 Am. Dec. 179; Phillis v. Gentin, 9 La. 210; State v. Moore, 8 Rob. 521; McCargo v. N. O. Ins. Co., 10 Rob. 202, 43 Am. Dec. 180; Maria v. Edwards, 1 Rob. 359; Nole v. De St. Romes, 3 Rob. 484; Mathews v. Boland, 5 Rob. 200; Fanchonette v. Grange, 5 Rob. 510; Verdun v. Splane, 6 Rob. 530; Jackson v. Bridges’ Heirs, 1 Rob. 172; Francois v. Lobrano, 10 Rob. 450; Winston v. Foster, 5 Rob. 113; Peltus v. Anders, 5 Rob. 7; Cotton v. Brien, 6 Rob. 115; Frierson v. Irwin, 5 La. Ann. 525; Baldree v. Davenport, 7 La. Ann. 589; State v. Dick, 4 La. Ann. 183; Conant v. Guesnard, 5 La. Ann. 697; Eulalie v. Long, 9 La. Ann. 9; Liza v. Puissant, 7 La. Ann. 80; Haynes v. Forno, 8 La. Ann. 35; Brown v. Smith, 8 La. Ann. 59; Barclay v. Sewell, 12 La. Ann. 262; Pauline v. Hubert, 14 La. Ann. 161; Gaudet v. Gourdain, 3 La. Ann. 136; Angelina v. Whitehead, 3 La. Ann. 556; Mary v. Brown, 5 La. Ann. 269; Trahan’s Heirs v. Trahan, 8 La. Ann. 455; Virginia v. Himel, 10 La. Ann. 185; Price v. Ray, 14 La. Ann. 697; Hardesty v. Wormley, 10 La. Ann. 239; Delphine v. Guillet, 11 La. Ann. 424; Henriette v. Barnes’ Heirs, 11 La. Ann. 454; Jamison v. Bridge, 14 La. Ann. 31; Jones v. State, 13 La. Ann. 406; Thompson v. Touriac, 13 La. Ann. 605; Deshotels v. Soileau, 14 La. Ann. 745; George v. Demouy, 14 La. Ann. 145; Carmouche v. Carmouche, 12 La. Ann. 721; Eugenie v. Preval, 2 La. Ann. 180; Arsene v. Pigneguy, 2 La. Ann. 621; Sophie v. Duplessis, 2 La. Ann. 724; Matilda v. Autrey, 10 La. Ann. 555; Maranthe v. Hunter, 11 La. Ann. 734; Vail v. Bird, 6 La. Ann. 223; Baker v. Tabor, 7 La. Ann. 556; McDowell v. Couch, 6 La. Ann. 366; State v. Whetstone, 13 La. Ann. 376; Collingsworth v. Covington,. 2 La. Ann. 406; Hynson v. Meuillon, 2 La. Ann. 798; Arnoult v. Deschapelles, 4 La. Ann. 41; Bibb v. Hebert, 3 La. Ann. 132; Blanchard v. Dixon, 4 La. Ann. 57; Mc-Gutcheon v. Angelo, 14 La. Ann. 34; Arnandez v. Lawes, 5 La. Ann. 127; Carmouche v. Bouis, 6 La. Ann. 96, 54 Am. Dec. 558; Benjamin v. Davis, 6 La. Ann. 472; Kemp v. Hutchinson, 10 La. Ann. 494; Grilling v. Routh, 11 La. Ann. 135; Gardiner v. Thibodeau, 14 La. Ann. 732; Williamson v. Norton, 7 La. Ann. 393; Spalding v. Taylor, 1 La. Ann. 195; Botts v. Cochrane, 4 La. Ann. 35; Dowty v. Templeton, 9 La. Ann. 549; Parwell v. Harris, 12 La. Ann. 50; Barry v. Kimball, 12 La. Ann. 372; Daret v. Gray, 12 La. Ann. 394; Buddy v. The Vanleer, 6 La. Ann. 34; Marciacq v. Wright, 13 La. Ann. 27; Vinot v. Bertrand, 6 La. Ann. 474; Oates v. Caffin, 3 La. Ann. 339; Leigh v. Meurice, 6 La. Ann. 476; Landry v. Klopman, 13 La. Ann. 345; Gaudet v. Gourdain, 3 La. Ann. 136; Carmelite v. Lacaze, 7 La. Ann. 629; Henderson’s Heirs v. Rost, 11 La. Ann. 541; Marshall v. Watrigant, 13 La. Ann. 619; State v. Solomon, 15 La. Ann. 463; Bateman v. Frisby, 15 La. Ann. 58; Rost v. Doyal’s Heirs, 15 La. Ann. 265; Foster v. Mish, 15 La. Ann. 199; Howes v. The Red Chief, 15 La. Ann. 321; Maille v. Blas, 15 La. Ann. *317 100; Beverley v. Str. Empire, 15 La. Ann. 432; Pelham v. The Messenger, 16 La. Ann. 99.
The foregoing is not given as being an exhaustive review of the decisions wherein the courts of this country might have had occasion to mate use of a term to designate persons of the mixed negro blood; but merely as a review of a certain number of cases taken at random, without choice, except that we have sought to include all those of our own reports.
The precise question of whether the word “negro” in its ordinary acceptation includes ■within its meaning mulattoes, quadroons, etc., has never been considered by the courts, so far as we have been able to ascertain. The decisions coming nearest to it are the following:
In People v. Hall, 4 Cal. 399, the court, interpreting the following statute: “No black or mulatto person, or Indian, shall be allowed to give evidence in favor of, or against a white man” — held, that the statute disqualified all races other than the Caucasian, and that, therefore, a Chinaman could not testify. In the course of the opinion the court said: “The word ‘black’ may include all ne-groes, but the term ‘negroes’ does not include all black persons.” It will be observed, also, that the Legislature of California did not consider that the words “black person” included “mulattoes,” for it deemed it necessary to add “or mulattoes” in order to make the statute include mulattoes, meaning, no doubt, by “mulattoes” all persons of mixed negro blood.
In Thurman v. State, 18 Ala. 278, the court, interpreting clause 5 of section 2 of the Code of Alabama, which contains a provision defining the term “negro” and “mulatto,” and makes the latter to mean “a person of mixed blood, descended on the part of the father or mother from negro ancestors to the third generation inclusive, though one ancestor of each generation may have been white,” said:
“The contention of appellant that she could not be convicted of the felonious grade of the offense charged if it appeared that her paramour was a mulatto, the indictment charging cohabitation with a negro, proceeded, doubtless, on the meaning of those terms, unaffected by the statute to which we have referred; that is, that a negro, generically considered, is a descendant of the whole blood from the black, woolly-headed race of Southern Africa, and that a mulatto is of the half blood, a person who is the offspring of a negress by a white man, or of a white woman by a negro.”
In Felix v. State, 18 Ala. 720, on an allegation that a person was a negro, and proof that he was a mulatto, and the question being as to whether the proof sustained the allegation, the court said:
“The word ‘negro,’ meaning a black man descended from the black race of Southern Africa, is not understood in common parlance to mean a mulatto, and our statutes seem to make the distinction between them.”
See, also, Linton v. State, 88 Ala. 216, 7 South. 261.
This, so far as we know, is the only extant judicial expression of opinion (barring that of the two judges of the criminal district-court for the parish of Orleans in the instant case) regarding the popular meaning of the word “negro” when used without any qualification, and in the absence of any statute enlarging the ordinary meaning of the word.
In State v. Davis, and Same v. Hanna, 2 Bailey (S. C.) 558, the court, interpreting a statute which disqualified negroes and mulattoes as witnesses, held that:
Every person of “a distinct and visible admixture of negro blood is to be denominated a mulatto, or person of color. * * * The distinctions which have obtained in the French and Spanish American colonies, and in our sister state of Louisiana, in relation to persons of mixed European and negro blood, have not been admitted in this state. There the descendant of a mulatto — that is, a person of an equal mixture of European and negro blood and a white — is called a ‘quadroon.’ This term has not been adopted in our state, and I have no doubt that according to the popular acceptation of the term among us such a person would be called a mulatto, or person of color.”
Let it be noted, first, that the court does not say that the descendant of a mulatto and *319 a white would be known in Louisiana as a “negro,” but as a “quadroon”; and that “according to popular acceptation such a person would be called [in South Carolina, not a negro, but] a mulatto, or person of color.”
In State v. Chavers, 50 N. C. 11, the court interpreted the following statutory provision: “That all free persons descended from negro ancestors to the fourth generation, inclusive, though one ancestor of each generation may have been a white person, shall be deemed free negroes and persons of mixed blood”— and held that: “A person must have in his veins less than one-sixteenth part of negro blood, before he will cease to be a free negro, no matter how far back you had to go to find a pure negro ancestor.”
Here the court was simply interpreting a statute and using the language of the statute.
In Ohio a person is white or colored accordingly as the white or the colored blood predominates. Monroe v. Collins, 17 Ohio St. 665; Williams v. School Dist., Wright (Ohio) 579; Lane v. Baker, 12 Ohio, 237, 243; Gray v. State, 4 Ohio, 353, 354; Anderson v. Millikin, 9 Ohio St. 568.
In Michigan a person of less than one-fourth negro blood has been held to be a white person within the meaning of the constitutional provision limiting the elective franchise to “white male citizens.” People v. Dean, 14 Mich. 406, 414.
In Frasher v. State, 3 Tex. App. 263, 30 Am. Rep. 131, under a statute forbidding marriage between “a white person and a negro or a person of mixed blood descended from negro ancestry to the third generation” —an indictment charged that the defendant, a white man, married a negro woman — it was held that it was insufficient to show that the woman was of the mixed blood.
The decision of this court in the case of Lee v. N. O. & Great Western R. R. Co., 125 La. 236, 51 South. 182, is extensively quoted from in the brief of the prosecution, as conclusive of the question now at issue; but we do not see that it has any bearing. The question there was not, as here, whether the' word “negro,” unqualified, embraces within its meaning persons of mixed negro blood, but as to what proportion of negro blood a person must be possessed of in order to be a colored person within the meaning of the separate railroad coach statute. The court was in no way, shape, or form, directly or indirectly, called upon in that case to interpret the word “negro” as including or not within its meaning, when unqualified and in absence of a defining statute, persons of mixed negro blood.
The other cases cited in the same connection in the brief filed in behalf of the prosecution are Clark v. Board of School Directors, 24 Iowa, 275; Johnson v. Town of Norwich, 29 Conn. 408; Pierce v. School Trustees, 46 N. J. Law, 79; Van Camp v. Board of Education of Logan, 9 Ohio St. 412.
In Clark v. Board of School Directors, supra, the question was whether under the Constitution and the statutes, which made no distinction between the white and the colored youths of the state, the school board could maintain separate schools for the white and the colored. There was absolutely no question in the ease about, the meaning of the word “negro.” In fact, that word does not occur in the decision. While arguing that, if the school board could exclude' African children from the schools, they could exclude Irish, French, German, English, etc., the court said:
“The term ‘colored race’ is but another designation, and in this country but a synonym, for ‘African.’ ”
This is the nearest the court came to mentioning the word “negro.”
In Johnson v. Town of Norwich, 29 Conn. 408, the question was whether a person hav *321 ing “one-fourth African negro blood” was “a, person of color.” Tbe court said:
“According to the common, general, and, indeed, universal, acceptation of the phrase, ‘persons of color’ in this community, it embraces not only all persons descended wholly from African ancestors, and therefore of pure and unmixed African blood, but those who have descended in part only from such ancestors, and have a distinct, visible admixture of African blood.”
There was no question in the case of the meaning of the word “negro,” nor is there anything in the case that can in the most distant manner throw any light upon the meaning of that term.
In Pierce v. School Trustees, 46 N. J. Law, 79, the statute forbade the exclusion of a child from any school “on account of his or her religion, nationality or color.” The excluded child was admittedly a mulatto. There was no pretense to its being white. The court said:
“Counsel further urges that since, under the rule of the trustees, an Italian (for example) as dark as the relator’s children would have been admitted, the exclusion was therefore owing, not to ‘color,’ but to race, which the statute does not prohibit. But I think the term ‘color,’ as applied to persons in this country, has had too distinct a history to leave possible such an interpretation of the law. Both in the statute and in the regulations of the respondents persons of color are persons of the negro race.”
Here the court was dealing with the meaning of the term “persons of color,” not with, the meaning of the word “negro race,” as including or not persons of mixed blood.
In Van Camp v. Board of Education of Logan, 9 Ohio St. 412, the court said:
“The only question presented is whether children of five-eighths white and three-eighths African blood, who are distinctly colored and generally treated and regarded as colored children by the community where they reside, are of right entitled to admission in white schools.”
The contention, as shown by the dissenting opinion, was as to whether the term “colored children,” made use of in different parts of the statute, had the same meaning as the term “black or mulatto,” as used in other parts of the statute. The court held that the object of the statute was to divide the school children of the state into two categories — the “white” and the “colored” — and proceeded, as follows:
“To which of these classes do the children of the plaintiff in error belong — ‘white’ or ‘colored’ ? They are in the ordinary, if they are not in the legal, sense, white.. The demurrer admits that they are, in fact, if not in law, ‘colored’ children. Our standard philologist, Webster, defines ‘colored people’ to be ‘black people,’ ‘Africans, or their descendants, mixed or unmixed.’ Such is the common understanding of the term. A person who has any perceptible admixture of African blood is generally called a ‘colored’ person.”
There was no denial that the children were colored persons, and there was no contention that they were “blacks or mulattoes.” The whole case turned upon whether the term “colored persons” made use of in the statute was intended to be restricted to “blacks or mulattoes,” or was intended to be extended to “colored persons” generally. The court was not called upon to interpret the term “negro.” It never occurred to the learned counsel in the case or to the court that the words “black or mulattoes” could be intended to include persons of five-eighths white blood. In the instant ease, the argument is that the term “negro race” includes persons of seven-eighths white blood.
These decisions are authority that a negro is necessarily a person of color; but not that a person of color is necessarily a negro. There are no negroes who are not persons of color; but there are persons of color who are not negroes. The term “colored,” as applied to race, was given the meaning of the word “negro” for the very purpose of having in the language a term including within its meaning both negroes and descendants of negroes; but the converse is not true. The word “negro” was never adopted into the language for the purpose of designating persons of mixed blood. On the contrary, it was for the purpose, and the sole purpose, of *323 expressing the meaning of persons of the negro race proper; and it can have now a different, or more enlarged, meaning only by enlarging its original meaning, as was done with the word “colored,” and imparting to it a meaning different from that which it originally bore in the language. The Legislature might do this, but the statute by which it did it would have authority only in Louisiana, and the word “negro” would still continue to mean, the world over, outside of Louisiana, except where its meaning had been in like manner statutorily enlarged, a person of the African race, or possessing the black color and other charateristics of the African.
We do not think there could be any serious denial of the fact that in Louisiana the words “mulatto,” “quadroon,” and “octoroon” are of as definite meaning as the word “man” or “child,” and that, among educated people at least, they are as well and widely known. There is also the less widely known word “griff,” which, in this state, has a definite meaning, indicating the issue of a negro and a mulatto. The person too black to be a mulatto and too pale in color to be a negro is a griff. The person too dark to be a white, and too bright to be a griff, is a mulatto. The quadroon is distinctly whiter than the mulatto. Between these different •shades, we do not believe there is much, if any, difficulty in distinguishing. Nor can there be, we think, any serious denial of the fact that in Louisiana, and, indeed, throughout the United States (except on the Pacific slope), the word “colored,” when applied to race, has the definite and well-known meaning of a person having negro blood in his veins. We think, also, that any candid mind must admit that the word “negro” of itself, unqualified, does not necessarily include within its meaning persons possessed of only an admixture of negro blood; notably those whose admixture is so slight that in their case even an expert cannot be positive. That much has to be admitted, else why should the Legislatures of all the Southern states (to say nothing of the Northern), save and except, perhaps, in the one case of the Virginia statute hereinabove referred to and commented on,, have uniformly abstained from using the word without qualifying it and have deemed it necessary to enlarge the ordinary, or dictionary, meaning of the word by a special statutory definition whenever they have desired to use it as including persons of mere mixed negro .blood; else, why should the word “colored” have received such universal adoption as meaning persons of negro blood pure or mixed, if there was already in the language a word expressing that meaning, and no special word was needed to express it? Well, then, if there are well-known words, in the language by which persons of negro blood whether pure or mixed may be unmistakably referred to or designated, and, in fact, since that meaning could be unmistakably conveyed by the use of a phrase instead of by a single word, and since the word “negro” of itself and unqualified has to be admitted to be to say the least of equivocal meaning as including persons not having the appearance of negroes, though having in their veins some admixture of negro blood, can any one say why the Legislature should 'have said “negro,” plain “negro,” or “negro race,” unqualified, if its intention was to include these persons of such slight admixture of blood? The Legislature must be supposed to know the words of the language and to use them according to their ordinary signification. When, therefore, it used the word “negro,” plain “negro,” or “negro race,” and not these other words or forms of speech including within their meaning persons who, though apparently white, yet had in their veins a perceptible admixture of negro blood, the inevitable inference is that it did so because it meant negro, plain negro,. or persons *325 ■black as negroes and Raving the characteristics of the negro, and not these other persons not coming within that description.
It might be different if there were something in the context to enlarge the ordinary meaning of the word; but there is nothing. The word stands isolated, and has to speak for itself.
A consideration of the object sought to be attained by a statute oftentimes throws light upon its meaning, and the argument is made that such is the case in the present instance, that the purpose was to prevent a mixing of bloods, and that that object would not be accomplished if only the blacks and not also the mulattoes and quadroons and octoroons and others of lesser mixture were included within the prohibition; that, in fact, the statute would then be practically a dead letter, since concubinage of the whites with the blacks is practically unknown.
That argument would have great weight if it did not, in the first place, lead to a disregard of- the plain meaning of words in advocacy of an attempt to reach the supposed spirit of the statute; and if it did not, in the second place, lose sight of facts of no less importance than the history of the negro race in Louisiana, and the whole past legislation of the state on the subject of the sexual relations of the two races. That history teaches that from birth of the state up to the last session of the Legislature concubinage with even the pure-blooded negro was not forbidden, and that to this day cohabitation with even the pure-blooded negro is not forbidden except in concubinage; and that from 1870 up to 1894 marriage with the pure-blooded negro was not only not forbidden, but was legal. And the abstention from legislating on the subject cannot be ascribed to a difference in conditions or to lack of interest in the subject; for, during all this time, conditions have been the same, and of all fit subjects for legislation this one of the relations of the two races has been one of the most prominent in public thought, demanding the closest and highest attention of the statesmen of the day. It is the growth and progress of ideas that has induced this legislation. Up to the session of 1894 the Legislature had evidently not deemed the time ripe for prohibiting marriage. Up to the session of 1908, it had not deemed the time ripe for prohibiting concubinage even with the pure-blooded negro. It has not deemed the time ripe for prohibiting cohabitation even with the pure-blooded negro, except in concubinage. Whether it deemed the time ripe in 1908 for prohibiting concubinage with the person of slight admixture of negro blood, no matter how slight the admixture, and has done so by this statute, is the question. If it has done so, it 'has certainly chosen to do it in most questionable form, when it could just as easily have done it in a form free from ambiguity by using the terms made familiar by the Constitution and by our other past legislation on the subject of the races. That our Legislature, which in the whole history of the state has not deemed it expedient to impose the slightest inhibition or penalty upon concubinage even with the pure-blooded negro, and which continues to deem, it inexpedient to impose the slightest restriction upon free illicit cohabitation with the pure-blooded negro except in concubinage,, should all of a sudden (conditions being unchanged) have awakened to the necessity of making concubinage even with persons barely exhibiting a trace of negro blood not only an offense and a crime, but a felony, is not á conclusion necessarily to be adopted. Legislation upon important and prominenj; subjects does not usually go by fits and starts, but by gradual progression. At all events, if the intention was thus to go at one clean sweep' from one extreme to the other, terms expressive of that intention should have been used,, and not terms which, in the light of the ordinary meaning of words, and in the light of *327 tlie past legislation of tlie state, and of the legislation of the other states, and of the judicial literature of the country, are not expressive of that intention, or, at best, express it ambiguously.
The connection also in which a word is used often operates as a limitation, or as an enlargement, of its meaning. Thus, this same word “negro,” if used in connection with the social relations of the whites and negroes and persons of mixed negro blood, would certainly convey the precise and exact meaning of the word “colored” when used in the same connection, because it is known that socially persons of mixed colored blood are known to be classed with negroes. A notice posted at the entrance of a ballroom that negroes are not admitted would certainly mean that colored persons — i. e., persons of mixed negro blood as well as negroes proper — were not admitted; and a similar notice at the entrance of a hotel or theater would approximately with the same certainty have the same meaning. In all states where separate car laws have been in operation for some time a like notice at the entrance of a railroad coach or street car would have the same meaning, though with diminishing certainty. But, while this is true of the word “negro” when used in connection with the social relations, it is not equally true of the word when used generally. For instance, a notice that all negroes were to be driven out of New Orleans would no doubt set everybody inquiring at what point the color line was to be drawn. Few in all likelihood would understand that the many people who have the appearance, education, and culture of whites were intended to be included in such an order. The contention of the prosecution is that the word “negro” is synonymous with “colored” — no matter in what connection it is used. This is not so. Had it been so, the law forbidding marriages would have used the word “negro,” and not the word “colored”; for “negro” would then have been the natural and obvious word to use.
It was suggested at the bar that the Legislature would hardly permit whites and oc-toroons to live in concubinage when forbidding them to ride together in railroad coaches and street cars. But the best answer to that suggestion is that — to use a homely illustration — “the proof of the pudding is in the eating thereof”; 'that the Legislature has as a matter of fact done that very thing; that from the time of the passage of the separate car bills, years ago, until this last session of the Legislature, not only octoroons, but jet black negroes, were allowed to live in concubinage with whites, although forbidden to ride in the same railroad coaches and street cars with them. The question which the court has to deal with in this case is not what the Legislature should have done, but what it has done. The only thing the courts can do (if they wish to keep within the legitimate scope of their functions) is to enforce the laws as they are written, interpreting them in accordance with the recognized and accepted canons of construction.
If conjectures are admissible, however, as to what considerations may have prompted the Legislature to enact separate car statutes, while leaving the concubinage and illicit commerce of the races untrammeled, one consideration which readily suggests itself is that without separate car statutes the whites would be brought in contact with the colored no matter how objectionable the proximity might be to them, whilst their concubinage or illicit commerce with them could only be voluntary. The laws on the subject have heretofore been for the protection of the individual; whereas now the time has ripened for the protection of the race. To what length has the Legislature’ gone in the latter direction is the question.
A consideration which fortifies the conclusion to which we have arrived is that penal *329 statutes are construed strictly. They are not “enlarged, or extended to cases not obviously within their words and purport.” Johnson v. Southern Pacific, 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363. They are construed in favorem libertatis. Cases not clearly embraced within them cannot be brought in by a doubtful construction. Nothing is a crime which the Legislature does not clearly and unmistakably make a crime. This is strikingly illustrated by the cases of State v. Smith, 30 La. Ann. 846, and State v. Depass, 31 La. Ann. 487, where incest went scot free because the statute making it a crime did not define what constitutes incest; and this, although incest is defined in every dictionary in the language.
Eor whatever it may be worth we will mention that, as framed by its author and presented to the Legislature, the act we are dealing with contained the following clause:
“That a person who is as much as one thirty-second part negro shall be, for the purpose of this act, a person of the negro race.”
Thus we find that the author of the act had not considered that the word “negro” of itself and unqualified, or in its ordinary acceptation, -would include within its meaning mulattoes, quadroons, etc. Following the example of all those who had had occasion to frame similar laws in the .past, where the word “negro” was used instead of the term “persons of color,” he added a clause enlarging the ordinary, dictionary meaning of the word “negro.” As he drafted and presented it, the act would most unquestionably have applied to all persons of color, and the question arises: Why did the Legislature strike out the clause which unquestionably gave this act that application? If the act was intended to have that application, certainly the clause could do no harm. The negro blood is barely traceable beyond the Vi6, and cer~ tainly not beyond the i/32. The reason for striking out this clause could not, then, have been for the purpose of extending its application to persons having less than 1/32 part of negro blood. And, if the object of striking out that clause was not to extend the application of the act, what could it have been, if not to restrict its application? The suggestion that the clause was stricken out because the word “negro” of itself and unqualified includes mulattoes, quadroons, octoroons, etc., and no additional clause was therefore necessary to give it that meaning, cannot explain the action of the Legislature in striking out this clause. If the act was intended to apply to mulattoes, quadroons, etc., the clause could do no harm, and there was absolutely no reason to strike it out. It could only tend to make the act more definite. The author of the act who doubtless had drafted it only after having read the legislation of the other states on the same, or kindred subjects, deemed such a definition necessary. Those who had occasion to frame the kindred legislation in other states deemed it necessary to add such a definition of the word.
To say that the definition was wholly useless would be to lose sight of the fact that until the decision of this court in the case of Lee v. N. O. & Great Northern Railroad Co., 125 La. 236, 51 South. 182, no one in this state — not the Governor, not any judge of any of the courts of the state — could have undertaken to say with any degree of authoritativeness what proportion of blood a person had to have in his veins in order to be classed as a person of color. The question had to come to this court, and a definition was adopted by this court only after study of the general jurisprudence upon the subject, and even then the definition first adopted was changed in consultation. To shy, under these circumstances, that the reason why the definition which for the purpose of enlarging the ordinary dictionary meaning of the word “negro” the author of this bill had added to it was stricken out was that the definition *331 was useless, mere surplusage, dead matter in the bill, is, in our opinion, to go dead against the plain truth of the matter. Had the definition not been stricken out, but remained in the bill, it would have saved this court much labor in the case of Lee v. N. O. & G. N. R. Co., supra. We can come to no other conclusion than that the Legislature struck the definition out because the statute with the definition in it included mulattoes, quadroons, etc., whereas, shorn of the definition, it did not include them.
Judgment affirmed.
His honor, the CHIEF JUSTICE, concurs, and hands down a separate opinion. See 52 South. 511.
His honor, Mr. JUSTICE LAND, dissents, and hands down a dissenting opinion (see 52 South. 511), in which dissenting opinion Mr. Justice NICI-IOLLS concurs.