290 So.2d 339 (1974)
Roy MESSINA, Individually and for and on behalf of the minor Gary Bernard Messina
v.
Anthony CIACCIO, Director of the Bureau of Vital Statistics Louisiana State Health Department.
No. 5371.
Court of Appeal of Louisiana, Fourth Circuit.
February 15, 1974.
*340 Donald M. Fendlason, Bogalusa, for plaintiff-appellee.
James P. Screen, New Orleans, for defendant-appellant.
Before SAMUEL, LEMMON and BOUTALL, JJ.
SAMUEL, Judge.
Plaintiff, on his own behalf and as administrator of the estate of his minor son, filed this suit to compel the defendant to issue a birth certificate designating the child as a member of the Caucasian race. Plaintiff and his wife, both Caucasians, had adopted the child and the state health department had refused to issue a new birth certificate under the adoption law because the department was of the opinion the records of the Bureau of Vital Statistics reflect that the child has 3/32 Negro blood.
After trial on the merits, the district court rendered judgment ordering the issuance of the birth certificate with a Caucasian racial designation. The defendant has appealed from that judgment.
The child was born out of wedlock on January 2, 1966. The identity and race of his father are unknown. The birth certificate issued for him by the state designated his race as Caucasian. He was surrendered to the state by his natural mother, whose race was also designated as Caucasian on her birth certificate, and he was placed in plaintiff's home by the Louisiana Department of Public Welfare. Plaintiff and his wife subsequently adopted him and the dispute over the racial designation on the new birth certificate to be issued under the plaintiff's name pursuant to the adoption law ensued.
There is little question that the child's physical characteristics are those of a Caucasian. The defendant relies on a well-documented genealogical chart, dating back to the late 1700's, which shows persons designated as possessing various racial ancestries in the child's maternal line. There are numerous inconsistencies in the racial designations contained in the vital statistics records, baptismal records, and census reports upon which the defendant's case is based. The conclusion reached by the defendant's witnesses was that the child's mother is 3/16 Negro and therefore, assuming the father was completely Caucasian, that the child is 3/32 Negro.
Act 46 of 1970 provides the arbitrary rule that only persons who have more than 1/32 of Negro blood can be designated as "colored", "mulatto", "black", etc.[1] This enactment altered the previous jurisprudential test that persons having "a traceable amount" of Negro blood would be considered members of the Negro race. However, while fixing an inflexible mathematical test, the legislature made no attempt to establish how the test would be met, the burden of proof to be applied, or the type of evidence needed to establish the required percentage of racial ancestory. This aspect of the statute was amply discussed in State ex rel. Plaia v. Louisiana State Bd. of Health,[2] as follows:
"The Act does not purport to provide the Registrar with any guide as to his mode of computation or as to the meaning of words in the Act and may be considered *341 quite vague in this regard. The Registrar's problem is, therefore, two-fold. First of all, he must undertake to produce a mathematical result by using an equation consisting of many unknowns, namely, the terms used on old documents in his possession classifying the ancestors of the child as "colored," "mulatto," "French," "mixed race," "brown," which terms are uncertain insofar as they call for any specific fractions of Negro blood in the individuals so designated. The other part of the Registrar's problem is that as he tries to prove what each of these various terms means in terms of percentage of Negro blood he is operating within the stringent framework of the Schlumbrecht burden of proof."[3]
The evidence offered by the defendant was predicated on traditional racial percentage classifications, based on the theory that a person designated as a "Negro" is in all cases 100% Negro in ancestry; a person designated as a "mulatto" is in all cases ½ Negro; a person designated as a "quadroon" is in all cases ¼ Negro; and a person designated as an "octoroon" is in all cases 1/8 Negro. These traditional racial percentage classifications were sufficient under the test existing before the 1/32 percentage was enacted, since under the traceable amount test, the percentage designations carried with them an unstated "more or less" as a part of their definitions. Such latitude formerly was acceptable in view of the flexibility which the prior test afforded. However, under the 1/32 test, the percentage of Negro blood in a person's lineage could vary greatly if someone far removed in his ascending line, while designated in lay terms as a "free person of color" thereby implying that the person was 100% Negro, was in fact a mulatto, quadroon or octoroon with only ½ ¼ or 1/8 Negro blood. Moreover, the statute establishing the 1/32 test makes no provision for persons who are, for example, 15/16 or 5/8 Negro blood, who were nevertheless classified as mulattoes or quadroons by their own designations or by the designations of various public officials, clergymen or census takers. With regard to this problem, in Plaia[4] this court made the following statement:
"Nevertheless, the Registrar concludes that Elizabeth Plaia has more than 1/32 Negro blood by defining a "mulatto," "free person of color," and "colored" as one who possesses ½ Negro blood. We decline to accept this premise. We fail to find authority which would allow a conclusion as suggested by the Registrar that a mulatto or colored as ½ black. A reading of the case of State v. Treadaway et al., 126 La. 300, 52 So. 500 (1910), wherein the court made an exhaustive review of the terminology relating to race, leads to a conclusion that the definition of the terms mulatto, colored, and Negro do not include any definitive or specific mathematical percentage of Negro blood in portion to white blood."
"In the instant case, were we to use the term mulatto to include ½ black, we would conclude that he possesses more than 1/32 Negro blood. On the other hand, were we to use the term mulatto to include 1/8 black, or 1/16 black, a different result would follow. In the absence of clear legislative expression and intent of the definition of the terms, we cannot supply those percentages with any degree of reliability. We agree with that part of Schlumbrecht as pointed out by plaintiff, which indicates that the race designations used are questionable."
In those cases in which a determination of whether a person is or is not 1/32 or less Negro in ancestry, the new statutory test requires that the exact racial percentage be used. In all such cases, under the new test it would seem necessary to have a genealogical charter on each person in a questioned *342 person's ascending line to determine with the exactness required by the statute the percentage of Negro blood ascribed to each ancestor. For it cannot be doubted that recorders, clergymen, census takers, and others having the occasion to make racial classifications of persons with whom they come in contact made no such detailed inquiry when using the traditional racial classifications in documents historically relied upon by the courts of Louisiana in adjudicating racial background.[5]
The defendant's use of the rounded percentage figures of 1, ½ and ¼ for persons designated as "Negro," "quadroon," and "octoroon," in the present case does not meet the requirement for exactness established by the legislature in providing the 1/32 Negro ancestry test. The exact racial percentages in those instances are necessary to determine whether the child has more than 1/32 or 1/32 or less of Negro blood Thus, the State has not met the burden imposed upon it by the statute.
For the foregoing reasons, the judgment appealed from is affirmed.
Affirmed.
NOTES
[1] "In signifying race, a person having one-thirty second or less of Negro blood shall not be deemed, described or designated by any public official in the state of Louisiana as "colored," a "mulatto," a "black," a "negro," a "griffe," an "Afro-American," a "quadroon," a "mestizo," a "colored person" or a "person of color." LSA-R.S. 42:267.
[2] La.App., 275 So.2d 201, 203; See also Thomas v. Louisiana State Board of Health, La.App., 278 So.2d 915.
[3] The case referred to is State ex rel. Schlumbrecht v. Louisiana St. Bd. of H., La.App., 231 So.2d 730.
[4] State ex rel. Plaia v. Louisiana State Bd. of Health, citation footnote 2.
[5] See, for example, State v. Treadaway, 126 La. 300, 52 So. 500; Sunseri v. Cassagne, 191 La. 209, 185 So. 1.